# United States Court of Appeals
## For the First Circuit

————————

No. 00-1517

CADLE COMPANY,

Plaintiff, Appellant,

v.

JAN RICHARD SCHLICHTMANN,

Defendant, Appellee.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

————————————————

Before

Torruella, Circuit Judge,

Campbell, Senior Circuit Judge,

and Schwarzer,[*] Senior District Judge.

————————

Scott L. Machanic, with whom Cunningham, Machanic, Celtin & Johnson, LLP, appeared on brief, for appellant.
Jan Richard Schlichtmann for appellee.

————————

—————————————

[*]Of the Northern District of California, sitting by designation.

October 4, 2001

_____

**Schwarzer, <u>Senior District Judge</u>**.  This appeal presents the questions of whether a security interest in the accounts receivable of a law firm--including an account arising from a contingent fee agreement--survives the firm's dissolution and the bankruptcy of one of its partners and, if it does, whether it attaches to a post-bankruptcy payment of the fee.  We hold that it does and reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

From 1990 to early 1991, the law firm of Schlichtmann, Conway, Crowley and Hugo (the firm) represented plaintiffs in certain environmental litigation in the Middlesex Superior Court, <u>Coble</u> v. <u>FL Aerospace Corp.</u>, Civil No. 89-76530, (the Groton matter).  Among the firm's accounts receivable was a contingency fee agreement, the fee to be paid to the firm at the conclusion of the litigation.  The firm had borrowed funds from the Boston Trade Bank (the Bank) and to secure those loans, the firm and its partners had signed a series of notes, guaranties, security agreements and UCC filings.  By virtue of these documents, the Bank held a security interest in the Groton fee receivable.  Before any part of this fee became payable, the Bank failed and the FDIC sold its assets--including the firm's notes and the security agreements--to Cadle Company (Cadle).

In December 1990, Jan Schlichtmann wrote to the Bank on behalf of the firm, reporting on the status of the outstanding loan accounts and on the progress of the Groton settlement.  In the letter,

-3-

Schlichtmann stated that "This letter serves as an additional security interest of the bank in all <u>Groton</u> fees received by this office."

In June 1991, the Superior Court approved the Groton settlement agreement, under which $825,000 was deposited into an escrow account, with distribution subject to the settlement's approval by the Massachusetts Department of Environmental Protection. In October 1991, Schlichtmann filed for bankruptcy under Chapter 7 of the Bankruptcy Code, causing the firm's dissolution pursuant to Massachusetts General Laws ch. 108A § 31 (1922) ("Causes of Dissolution"). In January 1992, the Bankruptcy Court issued a "Discharge of Debtor" order, releasing Schlichtmann from all his dischargeable debts.

Following Schlichtmann's bankruptcy and the firm's dissolution in 1991, Schlichtmann continued to work on the Groton matter until its final resolution in May 1995. In June 1995, $300,000 from the Groton settlement was deposited into Schlichtmann's escrow account. Of this amount, he distributed $100,000 to his former partners and $200,000 to himself ($110,000 of which he shared with Thomas Kiley, a former co-defendant who was dismissed from this case). Cadle received no part of the Groton fee settlement.

Cadle then filed this action against Schlichtmann, his former partners, and Kiley in June 1995. After considerable skirmishing, Schlichtmann/Kiley and Cadle filed cross-motions for summary judgment. On July 14, 1999, the district court denied both motions. The court

concluded that because Schlichtmann's post-bankruptcy work on the Groton matter was not performed on behalf of the dissolved partnership, he was entitled to a portion of the Groton fee to compensate for the work he performed in his individual capacity. Whether the two-thirds portion of the Groton fee retained by Schlichtmann was a proper division between Schlichtmann and his former partners was to be resolved at trial.

The case went to trial in November 1999.[1] Cadle advanced two theories: First, that Schlichtmann's retaining $200,000 of the Groton fee and distributing $100,000 to his former partners constituted conversion of funds in which Cadle had a security interest; and, second, that Cadle was entitled to the entire Groton fee, having forborne enforcing the notes it held in reliance on Schlichtmann's promise to deliver the fee when received. Cadle's request for a jury instruction on promissory estoppel was denied. The jury returned a verdict for defendant.

Cadle appeals on two grounds: First, that because it held a security interest in the entire Groton fee, the court should have granted its motion for summary judgment; and, second, that the court erred in refusing to instruct the jury on promissory estoppel. Because we conclude that Cadle was entitled to the portion of the Groton fee retained by Schlichtmann, we do not reach the promissory

[1]Defendants other than Schlichtmann were dismissed before trial.

estoppel issue.

The district court had jurisdiction under 28 U.S.C. § 1332, and this court has jurisdiction under 28 U.S.C. § 1291.

**DISCUSSION**

In its order denying Cadle's motion for summary judgment, the court acknowledged that the motion "hinges on its contention that the former law partnership . . . had a right to the entire $300,000 legal fee derived from the second Groton escrow account." The Cadle Co. v. Schlichtmann, Conway, Crowley & Hugo, 1999 WL 527715, at *1 (D. Mass. 1999). The court then reasoned that "[t]he only way it could potentially lay claim to this amount is if all compensable legal work required to gain access to the second escrow account had been completed at the time of the law firm's dissolution in October 1991." Id. The court observed that the settlement agreement required additional work by plaintiffs' lawyers post-bankruptcy, Schlichtmann performed that work, and he performed it in his individual capacity, rather than on behalf of the firm. He was, therefore, entitled to compensation. See id. The court concluded that "Cadle's security interest only extends to that portion of the Groton fee, if any, that belongs to the dissolved partnership." Id.

The fundamental error in this analysis is that it ignores the source of Schlichtmann's entitlement to the Groton fee. The fee to which Schlichtmann laid claim came out of the distribution from the

-6-

Groton settlement and became payable by reason--and only by reason--of the fee agreement between the (now dissolved) firm and the Groton plaintiffs.  The Distribution of Settlement Proceeds form clearly shows an allocation of 32.24% attorneys' fees (plus 4.02% for litigation consultation).  It is unquestioned that this amount became payable by reason of the fee agreement between the firm and the plaintiffs.  Thus, when Schlichtmann began to work for the plaintiffs after the dissolution, he simply took over the firm's work and carried out what the firm had agreed to do, for which it was to be compensated.

That the firm no longer existed is immaterial to Cadle's claim.  It had a security interest in the entire Groton fee; as Schlichtmann wrote in December 1990, "I want to assure you of the bank's security in these anticipated fees in the Groton case."[2]  And

---

[2]In this letter, Schlichtmann represented to the Bank that $800,000 was then being held in escrow by the Bank to secure the first part of the settlement, out of which $200,000 in fees would be paid to the firm, and that release of the funds was awaiting settlement of the co-defendant's share representing an additional $825,000, out of which the firm expected a second payment of $206,000.  Schlichtmann went on to state:

> I want to assure you of the Bank's security
> in these anticipated fees in the Groton
> case.  First, you should know that the case
> has been reported to the court by the
> parties as being settled.  The court has
> ordered the pa4ties to appear before it as
> soon as practical in January so that it may
> approve of the distribution of the funds.
> Out of the first payment we will pay off the
> $45,000 note.  This letter serves as an
> additional security interest of the bank in

that Schlichtmann may have taken over the Groton engagement and completed the work cannot operate to wipe out Cadle's acknowledged security interest in the fee from that work without the secured party's written consent; indeed, the security agreement specifically bars disposal of any collateral without the secured party's prior written consent.

Schlichtmann concedes that Cadle holds a security interest in the firm's accounts receivable which encompasses any Groton fee received by the firm. However, he contends that after the firm dissolved, the firm terminated its representation of the Groton clients, and thus left Cadle with a security interest in only the fees related to the work the firm performed on the matter prior to its dissolution. Agreeing with the district court, Schlichtmann characterizes his post-dissolution efforts on the Groton case as work performed in his individual capacity, not on behalf of the firm.

However, that the post-dissolution work on the Groton matter was performed by Schlichtmann does not alter Cadle's rights as a secured creditor. Partners cannot eliminate a security interest in the partnership's anticipated fees by transferring (without the creditor's

---

all <u>Groton</u> fees received by this office. We also anticipate making arrangements with the bank for an appropriate schedule to pay down the credit line.
The letter makes clear that the parties intended an assignment of a security interest in sums in escrow, not in future fees.

-8-

written consent) the client files, whether by dissolution of the partnership or otherwise. In <u>PNC Bank, Delaware</u> v. <u>Berg</u>, 1997 WL 527978 (Del. Super. Ct. 1997), the court held that a bank could assert its security interest under Article 9 of the Uniform Commercial Code in contingent fee agreements that had been transferred before having matured. There, Tighe, Cottrell, and Logan--partners in a firm called Berg, Tighe, Cottrell & Logan--withdrew from the firm and opened a new firm called Tighe, Cottrell & Logan ("Tighe"). The partners in the new firm took with them many client files, including the active files on which Tighe, Cottrell, and Logan had themselves been working. <u>See</u> <u>id.</u> at 2. PNC Bank claimed a continuing security interest in the contingent fee files. In its defense, Tighe argued that the security interest was lost as a result of the agreement between Berg and Tighe in which Berg surrendered any interest in the client files in return for Tighe's relinquishing its interest in the Berg firm. <u>See</u> <u>id.</u> at 10. The court rejected the argument, holding that unless PNC Bank authorized this transfer, it retained the right under Uniform Commercial Code § 9-306 to follow the collateral, the contingent fee files. <u>See</u> <u>id.</u> The court went on to reject the argument that Tighe had invested eighteen months of effort and additional expense on the assumption that the total of any contingent fee recoveries would be theirs, concluding that this "has absolutely nothing to offer on the issue of whether PNC Bank has a security interest." <u>Id.</u> at 11. In

denying Tighe's motion for reargument, the court said that accepting Tighe's contention

> would emasculate the protection which § 9-306(2) affords secured creditors. Any debtor would be able to destroy an existing Article Nine security interest simply by transferring both the right to payment and the performance due under the contract to an assignee. Section 9-104(f) simply does not countenance wiping out already-existing security interests.

PNC Bank, Del. v. Berg, 1997 WL 817869 *2 n.1 (Del. Super. Ct. 1997).

The instant case is analogous. The firm dissolved and Schlichtmann agreed with his former partners to take over the Groton matter in exchange for one-third of any recovered attorney's fee. Schlichtmann's departure from the firm and his assumption of responsibility for the Groton matter does not wipe out Cadle's right to follow the collateral--the fee in the Groton case. We agree with the court in PNC Bank, Delaware that to hold otherwise would allow "[a]ny debtor . . . to destroy an existing Article Nine security interest simply by transferring both the right to payment and the performance due under the contract to an assignee." PNC Bank, Del., 1997 WL 817869 at *2 n.1. Thus, Schlichtmann's claim to have performed work on the Groton matter in his individual capacity after the firm dissolved cannot defeat Cadle's rights as a creditor with a security interest in the Groton fee.

Schlichtmann would distinguish PNC Bank, Delaware because

it did not deal with the impact of bankruptcy on the entitlement of a discharged debtor to his post-bankruptcy earnings. Such a discharge extinguishes only *in personam* claims and generally has no effect on *in rem* claims against property. See Doral Mortgage Corp. v. Echevarria, 212 B.R. 185 (B.A.P. 1st Cir. 1997). The June 7, 1991, settlement agreement established the distribution of the settlement proceeds in the Groton matter and determined the amount of the fee due to the firm under the contingency agreement. This took place before Schlichtmann filed for bankruptcy. Cadle's security interest attached to this amount and it has an *in rem* claim to it. While Schlichtmann's post-bankruptcy work on the Groton matter no doubt contributed to the consummation of the settlement, the amount of the fee owed to the firm and therefore to Cadle was established outside of Schlichtmann's bankruptcy. Cadle's security interest in this property was not affected by Schlichtmann's bankruptcy.

Schlichtmann attempts to characterize his claim to the fee as post-petition earnings, personal property acquired after his debts were discharged. This argument is foreclosed by § 552 of the Bankruptcy Code, which concerns the effect of pre-petition security interests on post-petition earnings. See 11 U.S.C. § 552. "Its purpose is to prevent a creditor's pre-petition security interest in 'after-acquired property' . . . from attaching to property acquired by the estate or debtor-in-possession *after* the filing of a bankruptcy

-11-

petition.'" See N.H. Bus. Dev. Corp. v. Cross Baking Co., 818 F.2d 1027, 1029 (1st Cir. 1987). Under 11 U.S.C. § 552(a), "[P]roperty acquired . . . by the debtor after the commencement of the case is not subject to any lien resulting from a security agreement entered into by the debtor before the commencement of the case." Section 552(b)(1), however, carves out an exception to this rule:

> [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case *and to proceeds, product, offspring, or profits of such property,* then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b)(1) (emphasis added).

Section 552(b)(1) applies because Cadle's security interest in the firm's accounts receivable extends to proceeds from the Groton matter including the contingency fee at issue. Schlichtmann's December 27, 1990, letter to Boston Trade Bank compels that conclusion: "I want to assure you of the bank's security in these anticipated fees in the Groton case. . . . This letter serves as an additional security interest of the bank in all Groton fees received by this office." Because the security agreement covered the firm's accounts receivable--

property acquired before the bankruptcy proceedings--and the resulting security interest attached to the proceeds known as the Groton fee, this security interest attached to the Groton fee received by Schlichtmann post-bankruptcy.[3]

An analogous situation was before the court in <u>United Virginia Bank</u> v. <u>Slab Fork Coal Co.</u>, 784 F.2d 1188 (4th Cir. 1986). Slab Fork, a coal company, entered into a contract with Armco, Inc. to sell Armco coal it had mined. See <u>United Va. Bank</u>, 784 F.2d at 1189. Before Slab Fork filed for bankruptcy, United Virginia Bank acquired a security interest in Slab Fork's contract and its proceeds. See <u>id.</u> After Slab Fork shut down its mining operation and declared bankruptcy, it made arrangements for another company to mine and supply coal to Armco. See <u>id.</u> Armco continued to pay Slab Fork for the coal. See <u>id.</u> Slab Fork argued that the cash it generated after it filed for bankruptcy was not covered by the bank's security interest. See <u>id.</u> The court disagreed, holding that under 11 U.S.C. § 552(b), cash proceeds generated under a pre-petition contract received post-petition are subject to a pre-petition security interest in the contract and its proceeds. See <u>id.</u> "It is true," the court observed, "that coal had to

---

[3]Under both Uniform Commercial Code § 9-306(1) and Massachusetts General Laws ch. 106 § 9-306(1): "'proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." <u>See</u> <u>In re Mintz</u>, 192 B.R. 313, 318-19 (Bankr. D. Mass. 1996).

be supplied to Armco by or for Slab Fork before any right to payment arose, but that is true for all the payments under the contract, whether generated pre-petition or post-petition." Id. at 1190. The court concluded that "No change in the right to payment under the Armco contract was brought about by the filing of a bankruptcy petition, where the underlying asset and all proceeds therefrom were subject to a valid pre-petition security interest." Id.

Similarly, Cadle held a security interest in the firm's contingency fee agreement relating to the Groton matter and the proceeds from that agreement. That Schlichtmann performed much of the work after the firm's dissolution and his bankruptcy and before the right to payment arose does not alter the fact that Cadle held a security interest in that payment. We reject Schlichtmann's argument that the post-petition Groton fees were after-acquired personal property, free of Cadle's security interest.

The court recognizes that ordinarily post-petition earnings belong to the petitioner who has sought bankruptcy protection and not to the estate. See 11 U.S.C. § 541(a)(6). However, in this instance, the firm, through Schlichtmann, gave the bank an unqualified security interest in a specific fund ( i.e., the attorneys' fee share of the settlement), half of which had already been paid into an escrow account and the other half of which was paid into such an account well before Schlichtmann declared bankruptcy. Nothing in the commitment by

-14-

Schlichtmann suggested, so far as the bank was concerned, that the fees or the security interest were contingent on the performance of substantial further legal services from the firm or from Schlichtmann. There is no reason why schlichtmann should be able to back away from his own commitment.

Because we find that Cadle had a security interest in the entire Groton fee, we hold that it was entitled to judgment as a matter of law. We need not, therefore, reach the promissory estoppel issue.

It appears, however, that Cadle did not give notice of its claim to the fee distribution until after Schlichtmann had received the $300,000 and paid $100,000 to the other members of the former firm and (perhaps) shared a portion of it with Kiley. Thus, Schlichtmann is not liable for conversion of the $100,000 he distributed to the firm or of the amount he gave to Kiley before receiving notice from Cadle. Under Massachusetts law, the tort of conversion requires the plaintiff to prove that the defendant intentionally or wrongfully exercised control, ownership or dominion over personal property to which he had no right of possession at the time of the alleged conversion. See <u>Abington Nat'l Bank</u> v. <u>Ashwood Homes, Inc.</u>, 19 Mass. App. Ct. 503, 507 (1985). Cadle makes no claim that it made a specific demand on Schlichtmann for the $100,000 portion of the fee before Schlichtmann sent it to his former partners or for the amount he gave to Kiley, or that Schlichtmann otherwise wrongfully exercised control, ownership or

dominion over those amounts, or prevented Cadle from recovering them. Because Cadle's claim is based on a conversion theory, the evidence falls short of permitting recovery of these amounts from Schlichtmann; we express no opinion, however, with respect to any potential liability of the former partners or Kiley. Cadle is therefore entitled to judgment against Schlichtmann in the amount he retained after the payments to his former partners and Kiley before having received notice of Cadle's claim. Because the present record does not enable us to determine this amount, we remand to the district court to make that determination and to enter judgment for Cadle in the appropriate amount.

## CONCLUSION

The judgment is reversed and the matter is remanded to the district court for further proceedings consistent with this opinion.

**SO ORDERED.**