LAURA TAYLOR SWAIN, United States District Judge *142 The Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS" or "Plaintiff"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), commenced this adversary proceeding against certain secured bondholders of ERS (the "Defendants" or the "Bondholders"[2] ) pursuant to *143 the terms of a stipulation entered into by the parties on July 14, 2017. (See Docket Entry No. 40 in Adversary Proceeding No. 17-00213,[3] Ex. B (the "Stipulation").) The terms of the Stipulation provided, in relevant part, that on or before July 21, 2017, ERS "shall file an adversary complaint with this Court, seeking solely declaratory relief regarding ... the validity, priority, extent and enforceability of the prepetition and postpetition liens and security interests asserted by the Bondholders with respect to the ERS Bonds." (Stip. ¶ 6.A.) The Stipulation further provided, in relevant part, that the Bondholders "shall have the right, but not the obligation, to counterclaim on ... matters pertinent to the main claims." (Id. ) ERS filed the Complaint on July 21, 2017, seeking declarations concerning the scope, validity, and perfection of Defendants' asserted security interest. Defendants filed the Answer and Counterclaims (Docket Entry No. 36, the "Answer"), asserting nine counterclaims seeking declaratory relief with respect to the scope, validity, and perfection of their asserted security interest. On November 3, 2017, the parties filed cross-motions for summary judgment. (See Docket Entry No. 91, the "Plaintiff's Motion" and Docket Entry No. 94-1, the "Defendants' Motion.")
On August 17, 2018, this Court issued the Opinion and Order Granting and Denying in Part Cross Motions for Summary Judgment ("MSJ Order"), granting in part summary judgment in favor of ERS and denying Defendants' Motion in its entirety. See Financial Oversight & Mgmt. Bd. for P.R. v. Altair Glob. Credit Opportunities Fund (a), LLC, et al. (In re Fin. Oversight & Mgmt. Bd. for P.R. ), 590 B.R. 577 (D.P.R. 2018). The Court based its decision principally on the finding that Defendants did not possess a perfected security interest in any of the Pledged Property as defined in the Resolution. On appeal, the United States Court of Appeals for the First Circuit reversed and vacated this Court's determination regarding perfection, holding instead that Defendants had "satisfied the filing requirements for perfection as of December 17, 2015," and remanded for further proceedings two of Defendants' counterclaims that had not yet been addressed in light of the previous disposition. Altair Glob. Credit Opportunities Fund (a), LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 914 F.3d 694, 703 (1st Cir. 2019).
Following remand, the parties jointly requested that the Court determine an issue encompassed by Count III of the Complaint and Counterclaims II and III of the Answer that had been briefed by the parties in connection with their cross-motions for summary judgment but was not addressed by the Court in its MSJ Order.[4]
*144 This issue, defined by the parties as the "Section 552 Issue," concerns the "applicability of Section 552(a) of the Bankruptcy Code and whether it prevented any security interest from attaching to revenues received by ERS during the postpetition period" and is now ripe for adjudication. (Docket Entry No. 247, Joint Informative Motion Regarding Recommended Procedure Concerning Filing of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico's Amended Complaint and Adjudication of Undecided Issue (the "Joint Informative Motion"), at ¶ 3.) The parties agreed on the portion of the prior record upon which the Section 552 Issue should be determined, enumerating relevant materials in Exhibit B to the Joint Informative Motion.
The Court has considered carefully all of the arguments and submissions cited by the parties in connection with the Section 552 Issue. For the following reasons, summary judgment is granted in favor of ERS and denied in favor of Defendants with respect to Count III of the Complaint and Counterclaims II and III of the Answer.
I. BACKGROUND
The following facts are undisputed unless otherwise indicated.[5] The Court found the following facts to be undisputed in its MSJ Order:
On May 15, 1951, the legislature of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") enacted Act No. 447-1951 (codified, as amended, at 3 L.P.R.A. §§ 761 - 788, the "Enabling Act"). (Pl.'s 56(b) ¶ 1; Defs.' 56(b) ¶ 10.) The Enabling Act established ERS to administer the payment of pensions and certain other benefits for the retired employees of the Commonwealth, certain public corporations in Puerto Rico, and certain municipalities. See 3 L.P.R.A. § 761 (2016). As originally codified, the official English-language version of the Enabling Act denominated the retirement and benefits system as the "Employees Retirement System of the Insular Government of Puerto Rico and its Instrumentalities." (Docket Entry No. 92, the "Possinger Declaration," Ex. 1.)[6]
The Enabling Act provides that ERS may both issue debt and secure such debt with the assets of ERS. On January 24, 2008, ERS issued senior and subordinate pension funding bonds (collectively, the "ERS Bonds") pursuant to a Pension Funding Bond Resolution (Compl., Ex. D, the "Resolution"). (Pl.'s 56(b) ¶ 4; Defs.' 56(b) ¶ 22.) Pursuant to the Resolution, the holders of the ERS Bonds (the "ERS Bondholders" or "Bondholders") were granted a security interest in certain "Pledged Property." Specifically, Pledged Property is defined in the Resolution to include the following:
1. All Revenues.
2. All right, title and interest of the System in and to Revenues, and all rights to receive the same.
*145 3. The Funds, Accounts, and Subaccounts held by the Fiscal Agent, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Fiscal Agent under the terms of this Resolution, subject to the application thereof as provided in this Resolution and to the provisions of Sections 1301 and 1303.
4. Any and all other rights and personal property of every kind and nature from time to time hereafter pledged and assigned by the System to the Fiscal Agent as and for additional security for the Bonds and Parity Obligations.
5. Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.
(Resolution at VI-36.) The Resolution defines "Revenues" as follows:
1. All Employers' Contributions[7] received by the System or the Fiscal Agent.
2. With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for other purposes of this Resolution.
3. Net amounts received by the System pursuant to a Qualified Hedge.
4. Income and interest earned and gains realized in excess of losses suffered by any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of this Resolution, subject to the provisions of Sections 1301 and 1303.
5. Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the System or by the Fiscal Agent lawfully available for the purposes of this Resolution and deposited by or on behalf of the System or by the Fiscal Agent in any Fund, Account, or Subaccount held by the Fiscal Agent under the terms of this Resolution, subject to the provisions of Sections 1301 and 1303.
(Id. at VI-37.)
The Resolution is publicly available both electronically on the websites of the Government Development Bank, ERS, and the Electronic Municipal Market Access System, and in the hard copy records of ERS. (Defs.' 56(b) ¶ 42; see also Docket Entry No. 116, "Plaintiff's 56(b) Response," ¶ 42.)
On June 2, 2008, ERS executed a security agreement (Compl., Ex. E, the "Security Agreement") in connection with the Resolution. The Security Agreement grants, for the benefit of the ERS Bondholders, "a security interest in (i) the Pledged Property, and (ii) all proceeds thereof and all after-acquired *146 property, subject to application as permitted by the Resolution." (Id. ) The Security Agreement does not include a definition of the term "Pledged Property," instead providing that "[a]ll capitalized words not defined herein shall have the meanings ascribed to them in the Resolution." (Id. )
In re Fin. Oversight & Mgmt. Bd. for P.R., 590 B.R. at 583-85.
As noted in footnote 7 above, the Resolution defines "Employers' Contributions" as "contributions paid from and after the date hereof that are made by Employers," as well as "any assets in lieu thereof or derived thereunder which are payable to [ERS] pursuant to Sections 2-116, 3-105 and 4-113 of the [Enabling] Act."[8] (Pl.'s 56(b) ¶ 8; Defs.' 56(b) ¶ 31.) The Resolution further provided that, upon adoption of the Resolution, the Pledged Property was "immediately ... subject to the lien of th[e] pledge, assignment and security interest without any physical delivery thereof or further act," and the security interests in and liens on the Pledged Property became "valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the [ERS], irrespective of whether such parties have notice thereof." (Defs.' 56(b) ¶ 33.) At the time of the adoption of the Resolution in 2008, the ERS Enabling Act required employers to contribute a set percentage of the contribution of each employee participant during the term of the participant's employment to ERS. (Pl.'s 56(b) ¶ 9, Defs.' 56(b) ¶ 15; see also 3 L.P.R.A. § 781(d) (2008).) In 2013, the legislature of Puerto Rico enacted Act 3-2013, which amended the Enabling Act effective July 1, 2013.
Two UCC-1 financing statements were filed with the Department of State of the Government of Puerto Rico (the "Department of State") in 2008, and two amendment forms corresponding to each of the 2008 UCC-1s were received by the Department of State on or about December 17, 2015. (Pl.'s 56(b) ¶¶ 18, 23, 29.) Although the 2008 financing statements were insufficient to perfect the security interest under P.R. Laws Ann. Tit. 19, § 2152(1) (2008), the 2015 financing statement amendments met the requirements for perfection as of December 17, 2015. See In re Fin. Oversight & Mgmt. Bd. for P.R., 914 F.3d at 710, 719. Additionally, both the Commonwealth and the Oversight Board acknowledged the validity of the Bondholders' security interests and liens in court filings at various times prior to the commencement of proceedings for ERS under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2194. (Defs.' 56(b) ¶ 59 (citing Commonwealth's Br. in Opp'n, Altair Glob. Credit Opportunities Fund (A), LLC, et al. v. Governor Alejandro Garcia Padilla, et al., No. 16-cv-2696 (D.P.R.), Docket Entry No. 53, at 5 (stating that the "security interest and lien in favor of the ERS bondholders is indefinite, and ends only upon satisfaction of ERS's outstanding debt obligations"); Oversight Board's Br. in Opp'n, *147 Altair Glob. Credit Opportunities Fund (A), LLC, et al. v. Governor Alejandro Garcia Padilla, et al., No. 16-cv-2696 (D.P.R.), Docket Entry No. 56, at 12 (stating that the "perpetual revenue streams that secure [the Bondholders'] claims would still be available for future payments under yet-to-be negotiated fiscal plans or in future proceedings under PROMESA")).)
On May 21, 2017, a petition under Title III of PROMESA was filed on behalf of ERS. Section 301 of PROMESA incorporates certain sections of the Bankruptcy Code, which is codified in Title 11 of the United States Code, including Bankruptcy Code Sections 552, 902 (in part), and 928. As of July 1, 2017, ERS stopped receiving Employers' Contributions due to the implementation of the 2017 Commonwealth Pay-Go statute, under which the Commonwealth pays public pensions and various government entities reimburse the Commonwealth for those payments. This Opinion and Order does not address the legal status of payments made under the Pay-Go system, which are currently the subject of a related contested matter. (See Motion of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico for Relief from the Automatic Stay , Docket Entry No. 289 in Case No. 17-3566 (and related pleadings).)
II. DISCUSSION
The pending motions are brought pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.[9] Under Rule 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "possess[ ] the capacity to sway the outcome of the litigation under the applicable law," and there is a genuine factual dispute where an issue "may reasonably be resolved in favor of either party." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotation marks and citations omitted). The Court must "review the material presented in the light most favorable to the non-movant, and [ ] must indulge all inferences favorable to that party." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990) (internal quotation marks and citations omitted). When a properly supported motion for summary judgment is made, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotation marks and citation omitted). The non-moving party can avoid summary judgment only by providing properly supported evidence of disputed material facts. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993). Where the parties have made cross-motions for summary judgment, the court applies these principles in evaluating each motion.
The Court will first address the application of Section 552 of the Bankruptcy Code to Defendants' liens in the Pledged Property.
A. Section 552 of the Bankruptcy Code
Count III of the Complaint seeks a declaration that " section 552(a) of the Bankruptcy Code prevents any security interest from attaching to Revenues received by ERS during the postpetition period." (Compl. ¶ 143.) Counterclaim II of Defendants' Answer seeks a declaration that "the ERS Bondholders[ ] hold valid, enforceable, attached, perfected, first priority *148 liens on and security interests in the Pledged Property whether ERS became entitled to collect such property before or after the commencement of the ERS's Title III case." (Answer ¶ 247.)
Section 552(a) of the Bankruptcy Code, made applicable in the above-captioned Title III cases by 48 U.S.C. § 2161(a), provides as follows:
Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
11 U.S.C.A. § 552(a) (West 2016). Section 552(a) thus establishes a "general rule ... that property acquired by the bankruptcy estate post-petition is not subject to any lien resulting from a pre-petition security agreement." In re Nat'l Promoters & Servs., Inc., 499 B.R. 192, 205 (Bankr. D.P.R. 2013) ; see also Wheeling & Lake Erie Ry. Co. v. Keach (In re Montreal, Me. & Atl. Ry., Ltd.), 799 F.3d 1, 7 (1st Cir. 2015). "The purpose of [the] general rule of invalidating after-acquired property clauses is to facilitate the debtor's fresh start, rehabilitation, and reorganization by allowing the debtor to include as much property as possible in the estate to satisfy the claims of general creditors." In re Nat'l Promoters & Servs., Inc., 499 B.R. at 205.
Section 552(b)(1) establishes an exception to Section 552(a) :
Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.
11 U.S.C.A. § 552(b)(1) (West 2016). By virtue of this exception, "if a security agreement entered before the commencement of the case extends 'to proceeds, product, offspring or profits' of the original collateral, then the security interest continues to apply to the proceeds and so on, even when they are acquired by the debtor or estate after the bankruptcy case begins." Johnson v. Cottonport Bank, 259 B.R. 125, 128 (W.D. La. 2000). Among other things, Defendants contend that, because the Resolution provides a security interest in Pledged Property consisting of Revenues "and all rights to receive the same," and "Revenues" are defined to include Employers' Contributions and all cash and non-cash proceeds from the Pledged Property, the Resolution establishes that Defendants have broad liens that encompass contributions that have already been made as well as rights to future contributions and all proceeds of those rights. (Defs.' Mot. ¶¶ 41-42.) According to Defendants, the "proceeds" of such rights include payments or collection of contributions from employers. (Id. ¶ 48.) Defendants argue that their pre-petition collateral includes the right to receive future contributions, and therefore all such contributions-whenever made-are the proceeds of that pre-petition right. (Docket Entry No. 120, the "Defendants' Opposition," at ¶¶ 46-49.) According to the Bondholders, Section 552(b)(1) therefore renders Section 552(a) inapplicable to ERS's *149 right to receive such contributions after the petition date. (Defs.' Mot. ¶ 47.)
Significantly, Section 552(b)(1)'s exception to Section 552(a)'s general rule only extends to "property of the debtor acquired before the commencement of the case" and the "proceeds, products, offspring, or profits of such property." 11 U.S.C.A. § 552(b)(1) (West 2016). Put another way, Section 552(b)(1) does not extend to the proceeds of property which itself is acquired after the petition date. Thus, the crux of the issue now before the Court is whether post-petition contributions constitute property acquired after the petition date or the proceeds of pre-petition collateral.
The parties have identified no binding authority governing the question of whether post-petition Employers' Contributions to ERS are protected by Section 552(b)(1), nor has the Court's own research disclosed any such authority. Accordingly, the Court has considered carefully lower court decisions and the provisions of the relevant Resolution and statutes in determining the issue before it.
The instant factual context is analogous to that of In re HRC Joint Venture, 175 B.R. 948 (Bankr. S.D. Ohio 1994), where the creditor, TIAA, had a security interest in "the remittances to be made by Hyatt to the debtor under [a] Management Agreement." 175 B.R. at 952. In that case, the remittances to the debtor-which owned the building that housed a hotel-were generated by the post-petition acts of a third party-Hyatt Corporation-which operated the hotel in the debtor's building. Id. at 949. The court held that the remittances were after-acquired property subject to Section 552(a) and that the proceeds exception in Section 552(b) did not apply because "it is only post-petition acts which generated the collateral of TIAA in question, debtor's right to remittances each month under the Management Agreement." Id. at 953.
Here, the Employers' Contributions were calculated, at least in part, based upon the contributing employers' respective payrolls. The parties have identified three components of employers' obligations to ERS. (Docket Entry No. 199, the "Defendants' Supplemental Memorandum," at ¶ 10; Docket Entry No. 204 at 6-7.) The first component, referred to by Defendants as the Percentage of Payroll Contribution, is a regular contribution calculated as a percentage of an employer's payroll. See 3 L.P.R.A. § 787f. The second, referred to by Defendants as the Supplemental Contribution, is based upon the number of the employer's current pensioners as of the time of computation. See Act 3-2013 § 38; 3 L.P.R.A. § 761. The third, referred to by Defendants as the Additional Uniform Contribution, is based on the proportion of total employer contributions corresponding to each employer in a particular year. See 3 L.P.R.A. § 787q. Accordingly, all three components of contributions by employers are contingent on quantitative factors relating to each employer's workforce.
However, because the Additional Uniform Contribution varies each year (by reference to actuarial determinations and each employer's workforce demographics) to ensure that a certain level of assets is available for ERS, Defendants argue that changes in an employer's workforce would not affect the employer's overall obligations. (Defs.' Supp. Mem. ¶¶ 11-14 ("This standing obligation to make statutory contributions is not contingent on current employee labor, even if the mix of components of that obligation may change with changes to the employer's current payroll.").) Defendants also point to examples of statutory text expressing an intention or goal of setting overall contributions to *150 ERS at a level adequate to pay benefits and administrative costs, less contributions by employees. (Docket Entry No. 206 at ¶¶ 24-25.) However, the fact that statutory provisions state a goal of ensuring that contributions from employers are adequate to support ERS's cash flow does not mean that any particular employer's obligations are fixed. Rather, each employer's Percentage of Payroll Contribution, Supplemental Contribution, and Additional Uniform Contribution will vary based upon the size of an employer's payroll, the number of an employer's former employees, and actuarial factors. Thus, the employers' obligations remain inchoate until such time as the Employers' Contributions are calculated.
Thus, similar to Defendants here, the creditor in HRC Joint Venture had been granted a pre-petition security interest in expected future remittances. Id. at 952. Furthermore, as here, the right to receive particular future remittances arose based on post-petition events. In HRC Joint Venture, those rights were the rights to revenue from the management agreement; here, those rights are to funds payable by employers that are calculated based upon certain factors relating to their postpetition workforce demographics and payroll obligations. These employers' specific contribution payment obligations are not fixed and unchanging with respect to each employer, but, rather, are calculated based upon certain workforce demographic factors and actuarial determinations. Until the post-petition computations are performed based upon post-petition facts, the receivable to ERS does not exist and ERS has no right to collect the particular contribution. Thus, the relevant right to payment only comes into existence as the result of and contemporaneously with post-petition acts, and the proceeds of that right are therefore the proceeds of post-petition property; ERS's right to payment of the post-petition property is not "property of the debtor acquired before the commencement of the case." 11 U.S.C. § 552(b)(1). The proceeds of that post-petition property therefore are outside of the ambit of Section 552(b)(1). See HRC Joint Venture, 175 B.R. at 954 ; see also Local Loan Co. v. Hunt , 292 U.S. 234, 243, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) ("The earning power of an individual is the power to create property; but it is not translated into property within the meaning of the bankruptcy act until it has brought earnings into existence."); Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.), 316 B.R. 330, 336 (9th Cir. BAP 2004) ("[W]here it is only post-petition acts which generate an account receivable, those post-petition receivables will not be considered proceeds because there is no interest in, or connection to, the right in the account receivable created prepetition."); In re Texas Tri-Collar, Inc., 29 B.R. 724, 726-27 (Bankr. W.D. La. 1983) ("[A]ccounts receivable generated after commencement of the case are in no way proceeds, product, offspring, rents or profits of prepetition accounts receivable ....").
Although Defendants cite to case law for the proposition that post-petition collection of accounts receivable can be proceeds of property subject to pre-petition security agreements under Section 552(b)(1), those cases are not persuasive here because they concern the collection of receivables generated by the sale or other disposition of pre-petition property. See In re Bumper Sales, Inc., 907 F.2d 1430, 1432, 1439 (4th Cir. 1990) (holding that Section 552(b)(1) extended to the post-petition proceeds of sale of pre-petition inventory and to inventory purchased with the post-petition proceeds); In re Sunberg, 729 F.2d 561, 562-63 (8th Cir. 1984) (holding that Section 552(b)(1) extended to governmental farm *151 subsidies acquired after the petition date under a pre-petition contract providing for specific compensation for the non-crop use of farmland). Such proceeds of pre-petition collateral clearly fall within the scope of Section 552(b)(1). That factual context is materially different from the instant scenario, where the amount of Employers' Contributions from each employer remain unfixed until they become calculable and payable.[10]
Defendants' citation to Cadle Co. v. Schlichtmann, 267 F.3d 14 (1st Cir. 2001) is similarly unavailing. In that case, a creditor (Cadle) held a pre-petition security interest in a contingency fee to be paid to a law firm at the conclusion of a particular litigation referred to as the "Groton Matter." 267 F.3d at 16. A settlement agreement was approved by a state court with respect to the Groton Matter in 1991, and the settlement proceeds had been deposited into an escrow account prior to the commencement of the relevant bankruptcy case, "with distribution subject to the settlement's approval by the Massachusetts Department of Environmental Protection." Id. In 1991, one of the firm's partners (Schlichtmann) filed for Chapter 7 bankruptcy protection and, subsequently, the firm was dissolved. Id. Thereafter, Schlichtmann agreed to take over the Groton Matter in exchange for one-third of the fee received on it. Id. at 19. Following further work on the Groton Matter by Schlichtmann, the matter was entirely resolved and a portion of the settlement proceeds were transferred to Schlichtmann, who distributed a portion to his former partners. Id. at 16. Cadle-which had received no portion of that distribution-commenced litigation against Schlichtmann and his former partners. Id. The First Circuit held that Cadle had a right to the portion of the Groton Matter fee that Schlichtmann had retained. Id. at 17. The distribution of the settlement proceeds was governed by a prepetition agreement between the law firm and the plaintiffs in the Groton Matter. Id. The entirety of those amounts was deposited in escrow prior to commencement of Schlichtmann's Chapter 7 case, and, according to the First Circuit, the pre-petition letter that was the source of Cadle's security interest in the receivable "ma[de] clear that the parties intended an assignment of a security interest in sums in escrow, not in future fees." Id. at 18 n.3. Although the First Circuit stated that Schlichtmann's post-petition efforts on the Groton Matter were not relevant to its analysis, its reasoning emphasized that "the amount of the fee owed to the firm ... was established outside of Schlichtmann's bankruptcy," id. at 19, and that there was no substantial further performance owed by either Schlichtmann or his law firm with respect to the Groton Matter. Id. at 21. According to the First Circuit, Schlichtmann's efforts were not relevant (notwithstanding the general rule that "ordinarily post-petition earnings belong to the petitioner who has sought bankruptcy protection," id. ) because "in this instance, the firm, through Schlichtmann, gave the bank an unqualified security interest in a specific fund (i.e., the attorneys' fee share of the settlement) ... which was paid into [an escrow] account well before Schlichtmann declared bankruptcy." Id. ("Nothing in the commitment by Schlichtmann suggested, so far as *152 the bank was concerned, that the fees or the security interest were contingent on the performance of substantial further legal services from the firm or from Schlichtmann."). Cadle thus concerned the distribution of specific proceeds that were deposited in escrow and which were subject to an agreed allocation prior to the petition date. No such fund or pledge of an interest in such a pre-petition fund underlies the Bondholders' post-petition security claim to post-petition proceeds. Rather, at the time that ERS's Title III petition was filed, the relevant public employees had not even performed the labor generating the payroll upon which their employers' post-petition ERS contribution obligations would be computed.
The foregoing decisions persuade the Court that Section 552(b)(1) protects postpetition attachment of security interests in property acquired after the petition date where that property constitutes the proceeds of collateral that was fixed in form or quantity and owned by the pledgor pre-petition. Subsequent events, such as sales of pre-petition inventory or automatic payments of fixed amounts pursuant to pre-petition contractual rights, may generate post-petition proceeds that are protected by Section 552(b)(1) because their value is traceable to and calculable by reference to the pre-petition property without any additional post-petition labor or other intervening value-defining or -adding action. Here, the relevant statutory provisions made the accrual and computation of the employers' contribution obligations contingent upon their contemporaneous payrolls, workforce demographics, and the actuarial funding status of ERS. ERS therefore gained rights to collect the particular amounts once they could be computed, and there is nothing in the record to indicate the employers' actual post-petition contribution liabilities were the product of anything other than computations based on then-current payrolls, demographics, and actuarial factors. Accordingly, the contributions acquired post-petition were not proceeds of ERS's inchoate pre-petition right to receive future contributions computed by reference to yet-to-be determined post-petition circumstances.
B. Section 928(a) of the Bankruptcy Code
Counterclaim III of Defendants' Answer seeks a declaration that, "because the employer contributions constitute 'special revenues,' their security interest in and liens on employer contributions received by the ERS after the Petition Date remain enforceable pursuant to 11 U.S.C. § 928(a)." (Answer at ¶ 257.) Section 928 of the Bankruptcy Code provides another exception from the general rule established by Bankruptcy Code Section 552(a), stating that, "[n]otwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C.A. § 928(a) (West 2016).[11] "Special revenues" are defined, as here relevant, in Section 902(2)(A) and 902(2)(D) of the Bankruptcy Code as follows:
902(2)(A): "receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used primarily to provide transportation, utility, or other services, including the *153 proceeds of borrowings to finance the projects or systems"
902(2)(D): "other revenues or receipts derived from particular functions of the debtor, whether or not the debtor has other functions."
11 U.S.C.A. § 902 (West 2016).
The Bondholders contend that Employers' Contributions are "special revenues" within the meaning of both Sections 902(2)(A) and/or 902(2)(D) and are therefore exempt from Section 552(a).
Defendants argue that the Pledged Property constitutes "other revenues or receipts derived from particular functions of the debtor" within the meaning of Section 902(2)(D), characterizing the "particular functions" of ERS as "collecting and investing employer contributions and providing pension and other benefits to retired employees." (Defs.' Mot. ¶ 52.) Because ERS's "self-acknowledged function" is to collect and pay out pension payments, and because ERS is enabled to perform this function by its statutory right to receive employer contributions from the Commonwealth and other public corporations and municipalities, Defendants argue, employer contributions are "received" and thus "derived" from particular functions of ERS. (Id. ) Defendants also contend that the Employee Retirement System is a "system" within the meaning of Section 902(2)(A) because it was "created by the Commonwealth to administer the payment of pensions and the delivery of other benefits for retired employees of public corporations." (Defs.' Mot. ¶ 53.)
ERS argues that the Employers' Contributions are not "special revenues" as defined in either subdivision of Section 902(2) relied upon by Defendants. First, ERS contends that Section 902(2)(A) "concerns special revenues from the operation of utility or transportation systems" (Pl.'s Mot. at 32) and does not cover a benefits trust such as ERS, asserting that Employers' Contributions are not derived from the ownership, operation, or disposition of a project or system used primarily to provide transportation, utility, or other services. ERS invokes the principle of ejusdem generis in support of the proposition that, where general words follow a designation of a particular subject, the meaning of those general words will include only things of the same type or nature as those particular subjects. (Pl.'s Mot. at 32-33.) ERS also contends that the legislative history of Section 902(2)(A) confirms a limited interpretation of "other services."[12] (Id. ) In response to Defendants' argument that Employers' Contributions fall within the meaning of Section 902(2)(A) because ERS's name includes the word "system," ERS asserts that such an interpretation would expand the scope of services subject to Section 902(2)(A) in a manner that ignores Congress's specification of "transportation" and "utility" services in the definition, and that Defendants have failed to identify any case law expanding the scope of "special revenues" beyond a form of utility or transportation service. (Docket Entry No. 115, the "Plaintiff's Opposition," at 28.)
Second, ERS argues that the Revenues do not constitute special revenues under Section 902(2)(D) because the "particular functions" of ERS are to "collect and pay out pension payments to certain public retirees." (Pl.'s Opp. at 29.) ERS asserts that *154 Employers' Contributions are not "derived from" these "particular functions" of ERS and are instead derived from the labor of employees and used to fund the payment of pension benefits. (Pl.'s Mot. at 34.) Thus, ERS argues that Employers' Contributions are not a result of any services provided by ERS within the meaning of Section 902(2)(D). (Pl.'s Opp. at 29.)
The Court concludes that the Employers' Contributions are not "special revenues" within the meaning of either Section 902(2)(A) or Section 902(2)(D) of the Bankruptcy Code. "[W]here words of a particular or specific meaning are followed by general words, the general words are construed to apply only to persons or conditions of the same general kind as those specifically mentioned." Lyman v. Commissioner of Internal Revenue, 83 F.2d 811, 813 (1st Cir. 1936) (applying the principle of ejusdem generis to the statutory language "fires, storms, shipwreck, or other casualty"); see also McBoyle v. United States, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931). Here, the definition of special revenues as set forth in Section 902(2)(A) encompasses "projects or systems of the debtor that are primarily used or intended to be used primarily to provide transportation, utility, or other services." Applying ejusdem generis as a principle of statutory interpretation to Section 902(2)(A) limits the meaning of "other services" to projects or systems of "the same general kind" as transportation or utility projects or systems. References to "transportation" and "utility" in this definition contemplate a physical system of providing services to third parties. ERS is a benefits trust that does not provide any "transportation" or "utility" services, the Employers' Contributions received by ERS are not calculated by reference to or otherwise tied to the provision of transportation, utility, or similar services, and ERS does not produce any product provided to employers in return for payments into its system. The Court therefore concludes that the term "other services" as included in the definition of special revenues set forth in Section 901(2)(A) does not encompass Employers' Contributions.
Nor are the Employers' Contributions "special revenues" as defined in Section 902(2)(D) of the Bankruptcy Code. The contributions are a means of collection and delivery of deferred compensation to Commonwealth employees, and ERS therefore functions as a conduit for distribution of Employers' Contributions rather than as a provider of a "particular function" or service that itself produces revenue. There is no indication that ERS charges any fees for its services or that Pledged Property includes such fees. Nor, for substantially the same reasons explained in the preceding paragraph, are Employers' Contributions themselves revenues derived from the conduit function of ERS. Because the Employers' Contributions are not "special revenues" within the meaning of either Section 902(2)(A) or Section 902(2)(D) of the Bankruptcy Code, ERS is entitled as a matter of law to summary judgment dismissing Defendants' Counterclaim III.
C. Constitutional Avoidance
Defendants argue that the canon of constitutional avoidance mandates a construction of Section 552 of the Bankruptcy Code that renders it inapplicable to Defendants' pre-PROMESA security interests, thus avoiding the "grave and doubtful constitutional questions" raised by an interpretation of Section 552 that would "cut off" Defendants' liens on the Pledged Property. (Defs.' Mot. ¶ 54; Defs.' Opp'n ¶¶ 66-67 (citing Armstrong v. United States, 364 U.S. 40, 44, 46, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).)) Specifically, Defendants *155 characterize PROMESA as a "new and unprecedented federal law that for the first time in the history of the United States terminates post-petition liens granted by United States Territories on after acquired [ ] property in some circumstances" and argue that the retroactive application of Section 552, as incorporated by Section 301 of PROMESA, to invalidate any of Defendants' property rights without just compensation would effectuate a taking in violation of the Takings Clause of the Fifth Amendment. (Defs.' Mot. ¶¶ 54, 59-61; Defs.' Opp'n ¶ 66.) Defendants assert that this Court "should follow its 'duty' under the constitutional avoidance canon by 'adopt[ing] the latter' interpretation to avoid ruling on a serious constitutional question." (Docket Entry No. 150 at ¶ 31 (citing Jones v. United States, 529 U.S. 848, 857, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) ).)
Under the canon of constitutional avoidance, a court, in deciding "which of two plausible statutory constructions to adopt ... must consider the necessary consequences of its choice. If one [construction] would raise a multitude of constitutional problems, [then] the other [construction] should prevail ...." Clark v. Martinez, 543 U.S. 371, 380-81, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). However, the canon of constitutional avoidance is not a method of adjudicating constitutional questions. Id. at 381, 125 S.Ct. 716. Rather, it "is a tool for choosing between competing plausible interpretations of statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." Id. "The canon is thus a means of giving effect to congressional intent, not of subverting it." Id.
Defendants ask the Court to avoid an interpretation of Section 552 that would "cut off" their liens on the Pledged Property. However, it would be unreasonable to presume that Congress did not intend Section 552 to apply in these Title III cases to pre-existing liens in light of the express incorporation of Section 552 of the Bankruptcy Code into PROMESA through Section 301 of PROMESA. PROMESA was specifically enacted to enable Puerto Rico to address the unprecedented fiscal emergency that continues to plague the Commonwealth and its instrumentalities. This Court cannot subvert the clear intent of Congress by "choosing" a prospective interpretation of Section 552 that would disable a tool Congress provided in a statute specifically designed to be available to Puerto Rico. Defendants' request that the Court construe Section 552 as applicable only prospectively in the PROMESA Title III context is denied.
Accordingly, the Court holds that Section 552 applies to prevent the post-petition attachment of Defendants' liens.
III. CONCLUSION
For the foregoing reasons, summary judgment as to Count III of the Complaint and Counterclaims II and III of the Answer is granted in favor of Plaintiff. Defendants' summary judgment motion as to Count III and Counterclaims II and III is denied. The Court hereby declares that Bankruptcy Code Section 552 prevents any security interest resulting from liens granted in Defendants' favor prior to the commencement of ERS's Title III case from attaching to revenues received by ERS during the post-petition period. Counterclaims II and III are dismissed. In light of the preceding conclusions, Court need not address the parties' remaining arguments.
SO ORDERED.

Capitalized terms not defined herein shall have the meaning ascribed to them in the Adversary Complaint (Docket Entry No. 1, the "Complaint"). The parties' claims and counterclaims relating to Altair Global Credit Opportunities Fund (A), LLC and Nokota Capital Master Fund, L.P. were dismissed without prejudice pursuant to the Order Regarding Dismissal Without Prejudice of Certain Defendants-Counterclaimants Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and Fed. R. Bankr. P. 7041 (Docket Entry No. 234).

All docket entry references are to entries in Adversary Proceeding No. 17-00213, unless otherwise specified.

Count III of the Complaint seeks a declaration that "section 552(a) ... prevents any security interest from attaching to Revenues received by ERS during the postpetition period." (Compl. ¶ 143.) Counterclaim II of the Answer seeks a declaration that the Bondholders "hold valid, enforceable, attached, perfected, first priority liens on and security interests in the Pledged Property whether ERS became entitled to collect such property before or after the commencement of the ERS's Title III case." (Answer ¶ 247.) Counterclaim III of the Answer seeks a declaration that, "because the employer contributions constitute 'special revenues,' [the Bondholders'] security interest in and liens on employer contributions received by the ERS after the Petition Date remain enforceable pursuant to 11 U.S.C. § 928(a)." (Id. ¶ 257.)

Facts characterized as undisputed are identified as such in the parties' statements pursuant to D.P.R. Local Civil Rule 56(b) or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer. Citations to the parties' respective Local Civil Rule 56(b) Statements (Docket Entry No. 95 ("Defs.' 56(b)") or Docket Entry No. 93 ("Pl.'s 56(b)")) incorporate by reference the parties' citations to underlying evidentiary submissions. The Court declines to address assertions proffered by the parties that are immaterial or conclusory statements of law which the parties proffer as facts.

The official English-language version of the Enabling Act, as amended in 2013, designates the retirement and benefits system as the "Retirement System for Employees of the Government of the Commonwealth of Puerto Rico." See 3 L.P.R.A. § 761 (2016).

The Resolution provides that "Employers' Contributions shall mean the contributions paid from and after the date hereof that are made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113 of the [Enabling] Act." (Resolution at VI-33.)

At the time of the ERS Bond Resolution, Section 2-116 of the Enabling Act set forth various provisions governing Employers' Contributions, including the requirement that "the employer shall contribute to [ERS] a minimum percentage equal to 9.275% of the compensation regularly received by the participants." 3 L.P.R.A. § 781(d) (2008). Section 3-105 of the Enabling Act provided that every employer "shall compulsorily contribute to [ERS] a sum equal to ... 9.275% of the salary of each participant of the Program as long as the participant is an employee." 3 L.P.R.A. § 786-5 (2008). Section 4-113 of the Enabling Act provides that "the contributions required from the employer, as well as all annuities, benefits, reimbursements, and administration expenses, shall constitute obligations of the employer." 3 L.P.R.A. § 787 (2008).

Federal Rule of Civil Procedure 56 is made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056. See 48 U.S.C. § 2170.

Comparisons to Johnson v. Cottonport Bank, 259 B.R. 125 (W.D. La. 2000) fail for substantially the same reason. There, the district court, applying Louisiana law, determined that the debtor's right to receive a payment from a tribe was a property right that existed prior to the petition date. 259 B.R. at 130-31. Thus, the payments received pursuant to that right-which were not subject to variance or recalculation from month to month-were proceeds of a pre-petition property right.

Bankruptcy Code Section 928 is made applicable in these Title III proceedings by Section 301 of PROMESA.

See, e.g., H.R. Rep. No. 100-1011, at 6 (1988) (The "first type [of special revenues], described in new subsection (2)(A), consists of receipts derived from the ownership or operation of a debtor's systems or projects used to provide transportation, utilities, or other services. It would include receipts from the operation of water, sewage, waste, or electric systems.").