# United States Court of Appeals
## For the First Circuit

No. 19-1699

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtors.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Plaintiff, Appellee,

OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO,

Interested Party, Appellee,

v.

ANDALUSIAN GLOBAL DESIGNATED ACTIVITY COMPANY; GLENDON OPPORTUNITIES FUND, LP; MASON CAPITAL MASTER FUND LP; OAKTREE OPPORTUNITIES FUND IX (PARALLEL 2), L.P.; OAKTREE OPPORTUNITIES FUND IX, L.P.; OAKTREE VALUE OPPORTUNITIES FUND, L.P.; OAKTREE-FORREST MULTI-STRATEGY, L.L.C. (SERIES B); OCHER ROSE, L.L.C.; SV CREDIT, L.P.,

Defendants, Appellants,

PUERTO RICO AAA PORTFOLIO BOND FUND II, INC.; PUERTO RICO AAA PORTFOLIO BOND FUND, INC.; PUERTO RICO AAA PORTFOLIO TARGET MATURITY FUND, INC.; PUERTO RICO FIXED INCOME FUND II, INC.; PUERTO RICO FIXED INCOME FUND III, INC.; PUERTO RICO FIXED INCOME FUND IV, INC.; PUERTO RICO FIXED INCOME FUND V, INC.; PUERTO RICO FIXED INCOME FUND, INC.; PUERTO RICO GNMA AND U.S. GOVERNMENT TARGET MATURITY FUND, INC.; PUERTO RICO INVESTORS BOND FUND I, INC.; PUERTO RICO INVESTORS TAX-FREE FUND II, INC.; PUERTO RICO INVESTORS TAX-FREE FUND III, INC.; PUERTO RICO INVESTORS TAX-FREE FUND IV, INC.; PUERTO RICO INVESTORS TAX-FREE FUND V, INC.; PUERTO RICO INVESTORS TAX-FREE FUND VI, INC.; PUERTO RICO INVESTORS TAX-FREE FUND, INC.; PUERTO RICO MORTGAGE-BACKED & U.S. GOVERNMENT SECURITIES FUND, INC.; TAX-FREE PUERTO RICO FUND II, INC.; TAX-FREE PUERTO RICO FUND, INC.; TAX-FREE PUERTO RICO TARGET MATURITY FUND, INC.; UBS IRA SELECT GROWTH & INCOME PUERTO RICO FUND; ALTAIR GLOBAL CREDIT OPPORTUNITIES FUND (A), LLC; NOKOTA CAPITAL MASTER FUND, L.P.,

Defendants.

No. 19-1700

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Debtors.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,

Plaintiff, Appellee,

OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF

PUERTO RICO,

Interested Party, Appellee,

v.

PUERTO RICO AAA PORTFOLIO TARGET MATURITY FUND, INC.; PUERTO
RICO AAA PORTFOLIO BOND FUND, INC.;
PUERTO RICO AAA PORTFOLIO BOND FUND II, INC.; PUERTO RICO FIXED
INCOME FUND II, INC.; PUERTO RICO FIXED INCOME FUND III, INC.;
PUERTO RICO FIXED INCOME FUND IV, INC.; PUERTO RICO FIXED INCOME
FUND V, INC.; PUERTO RICO FIXED INCOME FUND, INC.; PUERTO RICO
GNMA AND U.S. GOVERNMENT TARGET MATURITY FUND, INC.; PUERTO RICO
INVESTORS BOND FUND I, INC.; PUERTO RICO INVESTORS TAX-FREE FUND
II, INC.; PUERTO RICO INVESTORS TAX-FREE FUND III, INC.; PUERTO
RICO INVESTORS TAX-FREE FUND IV, INC.; PUERTO RICO INVESTORS
TAX-FREE FUND V, INC.; PUERTO RICO INVESTORS TAX-FREE FUND VI,
INC.; PUERTO RICO INVESTORS TAX-FREE FUND, INC.; PUERTO RICO
MORTGAGE-BACKED & U.S. GOVERNMENT SECURITIES FUND, INC.; TAX-
FREE PUERTO RICO FUND II, INC.; TAX-FREE PUERTO RICO FUND, INC.;
TAX-FREE PUERTO RICO TARGET MATURITY FUND, INC.,

Defendants, Appellants,


ALTAIR GLOBAL CREDIT OPPORTUNITIES FUND (A), LLC; ANDALUSIAN
GLOBAL DESIGNATED ACTIVITY COMPANY; GLENDON OPPORTUNITIES FUND,
LP; MASON CAPITAL MASTER FUND LP; NOKOTA CAPITAL MASTER FUND,
L.P.; OAKTREE OPPORTUNITIES FUND IX (PARALLEL 2), L.P.; OAKTREE
OPPORTUNITIES FUND IX, L.P.; OAKTREE VALUE OPPORTUNITIES FUND,
L.P.; OAKTREE-FORREST MULTI-STRATEGY, L.L.C. (SERIES B); OCHER
ROSE, L.L.C.; SV CREDIT, L.P.; UBS IRA SELECT GROWTH & INCOME
PUERTO RICO FUND,

Defendants.

––––––––––––––––––

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

––––––––––––––––––

_____

  * Of the Southern District of New York, sitting by
designation.

Before

Howard, <u>Chief Judge</u>,
Lynch and Lipez, <u>Circuit Judges</u>.

_____

<u>Bruce Bennett</u>, with whom <u>Benjamin Rosenblum</u>, <u>David R. Fox</u>, <u>Geoffrey S. Stewart</u>, <u>Beth Heifetz</u>, <u>Sparkle L. Sooknanan</u>, <u>Isel M. Perez</u>, <u>Jones Day</u>, <u>Alfredo Fernández-Martínez</u>, and <u>Delgado & Fernández, LLC</u> were on brief, for Andalusian Global Designated Activity Company; Glendon Opportunities Fund, LP; Mason Capital Master Fund LP; Nokota Capital Master Fund, L.P.; Oaktree Opportunities Fund IX (Parallel 2), L.P.; Oaktree Value Opportunities Fund, L.P.; Oaktree-Forrest Multi-Strategy, L.L.C. (Series B); Ocher Rose, L.L.C; and SV Credit, L.P.

<u>Jason N. Zakia</u>, <u>Glenn M. Kurtz</u>, <u>John K. Cunningham</u>, <u>White & Case LLP</u>, <u>Alicia I. Lavergne-Ramírez</u>, <u>José C. Sánchez-Castro</u>, <u>Maraliz Vázquez-Marrero</u>, and <u>Sánchez Pirillo LLC</u> on brief for Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico GNMA and U.S. Government Target Maturity Fund, Inc.; Puerto Rico Investors Bond Fund I, Inc.; Puerto Rico Investors Tax-Free Fund II, Inc.; Puerto Rico Investors Tax-Free Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; Puerto Rico Investors Tax-Free Fund V, Inc.; Puerto Rico Investors Tax-Free Fund VI, Inc.; Puerto Rico Investors Tax-Free Fund, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; and UBS IRA Select Growth & Income Puerto Rico Fund.

<u>Martin J. Bienenstock</u>, with whom <u>Timothy W. Mungovan</u>, <u>John E. Roberts</u>, <u>William D. Dalsen</u>, <u>Stephen L. Ratner</u>, <u>Mark D. Harris</u>, <u>Jeffrey W. Levitan</u>, <u>Margaret A. Dale</u>, and <u>Proskauer Rose LLP</u> were on brief, for the Financial Oversight and Management Board for Puerto Rico, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

<u>Catherine L. Steege</u>, with whom <u>Melissa M. Root</u>, <u>Ian Heath Gershengorn</u>, <u>Lindsay C. Harrison</u>, <u>Robert D. Gordon</u>, <u>Richard Levin</u>, <u>Jenner & Block LLP</u>, <u>A.J. Bennazar-Zequeira</u>, <u>Héctor M. Mayol Kauffmann</u>, and <u>Bennazar, García & Milián, C.S.P.</u> were on brief, for the Official Committee of Retired Employees of the Commonwealth of Puerto Rico.

January 30, 2020

**LYNCH**, **Circuit Judge**. The appellant Bondholders own bonds issued in 2008 by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System"). More than eight years after the bond issuance, Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. §§ 2101-2241, to address Puerto Rico's financial crisis and, under PROMESA's Title III, id. §§ 2161-2177, provided many bankruptcy protections to Puerto Rico's government agencies. The Commonwealth and the System filed Title III petitions for such protections.

Pursuant to a stipulation in earlier litigation between the System and the Bondholders in 2017, the System filed two lawsuits against the Bondholders in the Title III court seeking declaratory relief on the "validity, priority, extent and enforceability" of the Bondholders' asserted security interest in the System's "postpetition assets," including "[employer] contributions [to the System] received postpetition." On summary judgment, the Title III court addressed three arguments made by the Bondholders. Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 385 F. Supp. 3d 138, 147–55 (D.P.R. 2019). First, the Bondholders claimed that their security interests fit within exceptions under § 552 of the Bankruptcy Code. Id. at 152. The Title III court rejected that claim. Second, the Bondholders argued that they are

- 6 -

entitled to the protection of the "special revenue" provisions of PROMESA.  Id.; see also 48 U.S.C. § 2161(a) (incorporating relevant parts of 11 U.S.C. §§ 902, 928).  The Title III court held that the Bondholders were not so protected, as Employers' Contributions were not special revenues.  Andalusian, 385 F. Supp. 3d at 154.  Finally, the Bondholders argued that the statutes should be construed in their favor on their first two arguments to avoid an impermissible taking under the Takings Clause of the Fifth Amendment.  Id. at 154–55.  The Title III court rejected this argument as well.  Id. at 155.  We affirm.

## I.
## Background

We describe the relevant statutes, facts, and procedural history of the appeals.  For additional facts and procedural history, we refer the reader to the earlier litigation between these parties about these bonds.  See Altair Glob. Opportunities Credit Fund, LLC v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 914 F.3d 694, 702–09 (1st Cir.), cert. denied, 140 S. Ct. 47 (2019).

A.   PROMESA and the Bankruptcy Code

PROMESA created the Financial Oversight and Management Board for Puerto Rico (the "Board") and authorizes that Board "to restructure the debt of the Commonwealth of Puerto Rico through 'quasi-bankruptcy proceedings.'"  Autonomous Municipality of Ponce

- 7 -

(AMP) v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 939 F.3d 356, 359 (1st Cir. 2019) (quoting Assured Guaranty Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 872 F.3d 57, 59 (1st Cir. 2017)). Under 48 U.S.C. § 2161(a), which incorporates § 552 of the Bankruptcy Code into PROMESA, any property acquired postpetition by the Title III debtor is not subject to any prepetition lien, unless an exception applies.[1] 11 U.S.C. § 552(a). The Bondholders' claim is that their liens survive because of the exception in § 552(b)(1) for the proceeds of property subject to a prepetition lien. When the exception applies, the lien survives the filing of the Title III petition. See id. § 552(b)(1). For this exception to apply to a security interest, (1) the Title III debtor must have property before filing the Title III petition; (2) a security interest must attach to that property prepetition; (3) that property must generate some proceeds postpetition; and (4) a prepetition security agreement must grant a security interest in both the original prepetition property and proceeds arising from it postpetition. Id.

---

[1] We employ "lien" and "security interest" interchangeably, as the liens at issue were created by agreement. See 11 U.S.C. § 101(51) (defining "security interest" as a "lien created by an agreement"); see also 48 U.S.C. § 2161(a)(incorporating 11 U.S.C. § 101(51)).

In addition, § 552(a)'s bar on liens against property received postpetition does not apply to "special revenues acquired by the [Title III] debtor after the commencement of the [Title III] case." Id. § 928(a); see also 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 928(a) into PROMESA). These "special revenues . . . remain subject to any [prepetition] lien." 11 U.S.C. § 928(a). Only these special revenues as defined under § 902(2)(A) and § 902(2)(D) are argued by the Bondholders to apply here. Section 902(2)(A) special revenues are "receipts derived from the ownership, operation, or disposition of projects or systems of the [Title III] debtor that are primarily used or intended to be used primarily to provide transportation, utility, or other services, including the proceeds of borrowings to finance the projects or systems." Id. § 902(2)(A). Section 902(2)(D) special revenues are "other revenues or receipts derived from particular functions of the [Title III] debtor, whether or not the debtor has other functions." Id. § 902(2)(D).

B.   The Puerto Rico Enabling Act for the System and the Bond Resolution

In 1951, the Commonwealth created by statute the System as both a trust and government agency. Law No. 447 of May 15, 1951, 1951 P.R. Laws 1298 (the "Enabling Act") (codified as amended at P.R. Laws Ann. tit. 3, §§ 761–788). The System provides pensions and retirement benefits to employees and officers of the

- 9 -

Commonwealth government, municipalities, and public corporations, as well as employees and members of the Commonwealth's Legislative Assembly. P.R. Laws Ann. tit. 3, § 764. The Enabling Act designated the System as "independent and separate" from other Commonwealth agencies and funded the System through mandatory contributions from both employers and employees, and the System's investment income. Altair, 914 F.3d at 704 (quoting P.R. Laws Ann. tit. 3, § 775). The employer contributions, in turn, were allocated to the System through annual appropriations in the Commonwealth budgets. P.R. Laws Ann. tit. 3, § 781(g) (repealed 2013).

As of 2008, the Enabling Act authorized the System to issue bonds, subject to conditions. Altair, 914 F.3d at 704 (citing P.R. Laws Ann. tit. 3, § 779(d)). Before the System's assets can be used for security as to bonds, the statute requires both the consent of two-thirds of the System's Board of Trustees and "the enactment of legislation by the Legislative Assembly." P.R. Laws Ann. tit. 3, § 779(d). On January 24, 2008, the System's Board of Trustees adopted a resolution authorizing the issuance of $2.9 billion in bonds. Altair, 914 F.3d at 704. The Enabling Act, as amended, references this bond issue, stating: "It is hereby clarified for future generations that the Retirement System made a bond issue amounting to three billion dollars, which bears

between 6.25% to 6.35% interest[2] to bondholders, thus encumbering employer contributions of the System for up to fifty years." P.R. Laws Ann. tit. 3, § 779(d). The Bondholders own some of these bonds.

When the System issued these bonds, it granted the Bondholders security interests in "Pledged Property." That definition is very important to the resolution of the issues in this case. The 2008 Pension Bond Funding Resolution ("Bond Resolution") defines "Pledged Property" as:

> [1] All Revenues. [2] All right, title and interest of the System in and to Revenues, and all rights to receive the same. [3] The Funds, Accounts, and Subaccounts held by the Fiscal Agent . . . . [4] Any and all other rights and personal property . . . assigned by the System to the Fiscal Agent . . . . [5] Any and all cash and non-cash proceeds, products, offspring, rents and profits from any of the Pledged Property . . . .

"Revenues" is further defined to include "Employers' Contributions received by the System." The Resolution defines "Employers' Contributions" as "the contributions paid from and after the date hereof that are made by the Employers and any assets in lieu thereof or derived thereunder which are payable to the System

---

[2] This interest rate exceeded the then-market municipal borrowing rate of closer to four-and-a-half percent, and the 2008 System bonds are, under certain circumstances, tax-exempt. See Board of Governors of the Federal Reserve System, State and Local Bonds - Bond Buyer Go 20-Bond Municipal Bond Index (DISCONTINUED), Economic Research: Federal Reserve Bank of St. Louis (Oct. 7, 2016), https://fred.stlouisfed.org/series/WSLB20/ (indexing representative bonds' interest rates for bonds higher rated than those at issue here).

pursuant to Sections 2-116, 3-105 and 4-113 of the [Enabling] Act."[3]

The System also executed a security agreement, in which it granted the Bondholders a security interest in the Pledged Property and "all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution."

In 2013, the Commonwealth legislature amended the Enabling Act in response to the ongoing financial crisis. 2013 P.R. Laws 3. Among other changes, the 2013 Amendment repealed P.R. Laws Ann. tit. 3, §§ 781, 786-5 (commonly referred to by their section numbers in the original Enabling Act, 2-116 and 3-105) with respect to active employees. Id. §§ 9, 12. In effect, this froze the accrual of pension benefits for active government employees. But, through a savings clause, the 2013 Amendment required that employers continue to make contributions to pay benefits accrued by active employees up to the effective date of the Act. P.R. Laws Ann tit. 3, § 761a. So, while the 2013 Amendment stopped the accumulation of new benefits, it also preserved for accrued benefits the concept of Employers' Contributions, and also how those Contributions were calculated, including the dependence of the calculation on the ongoing payrolls of each employer.

---

[3]    Codified at P.R. Laws Ann. tit. 3, §§ 781, 786-5, 787, respectively.

In 2017, the Commonwealth again amended the Enabling Act. See Con. H.R. Res. 188, 18th Legislative Assemb. (2017) ("Concurrent Resolution 188"); 2017 P.R. Laws 106. Until the 2017 Amendment, the Enabling Act required that the contribution of government employers be at least 9.275% of their participating employees' compensation (with respect to accrued benefits). P.R. Laws Ann. tit. 3, § 781(d) (repealed 2013). The 2017 Amendment eliminated the employers' obligation to contribute to the System and required the Commonwealth General Fund to pay individual pensions.[4] See Concurrent Resolution 188. The Act does not authorize the System to charge any fees for managing participant investments or providing retirement services. P.R. Laws Ann. tit. 3, § 781.

---

[4] The legal status of these payments and the validity of the 2017 Amendment are subject to other litigation. See, e.g., Altair Glob. Credit Opportunities Fund (A), LLC v. United States, 138 Fed. Cl. 742 (Fed. Cl. 2018); Complaint, Altair Glob. Credit Opportunities Fund (A), LLC v. Commonwealth of Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.), No. 17-00219-LTS (D.P.R. filed July 27, 2017), ECF No. 1. This other litigation raises the issues of whether the 2017 Amendment actually eliminated the Bondholders' liens and, if so, whether that action was constitutional. The Title III court has stayed the proceedings pending the outcome of the instant appeal. Order, Altair, No. 17-00219-LTS (D.P.R. filed Sept. 6, 2018), ECF No. 69. Although the 2017 Amendment repealed the Employers' Contributions provision of the Enabling Act, subsequent events could reinstate these provisions. In consequence, and for clarity, we refer to these provisions in the present tense with respect to the Contributions still required after the 2013 Amendment.

The Enabling Act before 2017 specifies the consequences if employers fail to make their required Contributions to the System.  The "director [or 'head'] of an agency, public corporation or municipality" who "knowingly, willfully, and without just cause fails to remit" his/her agency's Contributions to the System "shall be guilty of a felony."  P.R. Laws Ann. tit. 3, § 781a(a), (f).  More significant for present purposes, the Enabling Act also directs that, upon receiving a certificate of debt from the Administrator of the System, it is Centro de Recaudación de Ingresos Municipales ("CRIM"), Puerto Rico's municipal property tax collection agency, which is obligated to pay the delinquent Employers' Contributions of municipalities "on or before the fifteenth (15) day of each month" and it is the Commonwealth Secretary of the Treasury who is obligated to pay the delinquent Employers' Contributions of "an agency, public corporation, or any [Commonwealth-level government] entity . . . immediately."  Id. § 781a(g), (h).  The statute also states that delinquent Employers' Contributions (and several additional types of debt) "shall have priority over any other outstanding debt of" a municipality or a Commonwealth-level entity that fails to make its Contribution.  Id.  CRIM and the Secretary of the Treasury are obligated to give priority to those debts before addressing other debts of the municipality or Commonwealth entity.  The Enabling Act's

provisions do not accord the System any remedy or mechanism to collect delinquent Contributions.  See id. § 781a.

C.   Procedural History

The first time this court addressed these bonds, it held that the Bondholders had perfected a security interest in whatever property was pledged to them under the bond issuance's security agreement.  Altair, 914 F.3d at 719.  We then remanded to the Title III court to determine whether the Bondholders held "valid, enforceable, attached, perfected, first priority liens on and security interest in [prepetition and postpetition Employers' Contributions]" and whether the Employers' Contributions were special revenues under 11 U.S.C. § 928(a).  Id. at 720.

As said, the Title III court concluded that, under 11 U.S.C. § 552(b)(1), postpetition Employers' Contributions were not proceeds of a secured, prepetition property right of the System to receive them.  Andalusian, 385 F. Supp. 3d at 152.  It also concluded that the Employers' Contributions were not special revenues under § 902(2)(A) or (D).  Id. at 154.  Finally, the court rejected the Bondholders' argument that the canon of constitutional avoidance required it to construe PROMESA's incorporation of § 552 to be prospective only.  Id. at 155.  In consequence, the Title III court held that, under § 552(a), postpetition Employers' Contributions were not subject to any security interest of the Bondholders, denied summary judgment to

- 15 -

the Bondholders, and granted summary judgment to the Board.  Id.
These appeals followed.

## II.
## Standard of Review

"We review de novo the grant or denial of summary judgment, as well as pure issues of law." Rodriguez v. Am. Int'l Ins. Co. of P.R., 402 F.3d 45, 46–47 (1st Cir. 2005) (citation and emphasis omitted).  We must "'view [the parties' cross motions for summary judgment] separately,' in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor."  OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012) (quoting Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010)).

## III.
## Section 552 Prevents the Bondholders' Security Interest from Attaching to Postpetition Employers' Contributions

The Bondholders argue that § 552(a) does not bar a lien on Employers' Contributions received postpetition because those Contributions are "proceeds" within the meaning of § 552(b)(1). That is, the Bondholders argue that (1) the System's statutory authority to receive Employers' Contributions constituted a property right; (2) the Security Agreement gave the Bondholders a security interest in the System's property right to receive those Contributions; (3) the Employers' Contributions actually received postpetition are the "proceeds" of the System's prepetition

- 16 -

property right; and (4) the Security Agreement gave the Bondholders a security interest in these "proceeds" of the System's prepetition right. They argue they have an interest in both the System's prepetition right to receive postpetition Employers' Contributions and in the employers' prepetition obligations to make postpetition contributions to the System on account of any actuarial deficit. They argue that these obligations continue postpetition and so are proceeds of the prepetition property.[5] After addressing the contract and statutory language common to these theories, we address each theory in turn.

We look at a combination of the points of the above analysis by examining the extent of the Bondholders' security interest as defined in the Bond Resolution to determine whether, as of the petition date, that interest constituted a property right to receive postpetition Employers' Contributions. The Bondholders' security interests are restricted to those defined as Pledged Property.

"Pledged Property" is defined in the Bond Resolution to include "Revenues," and Revenues are restricted to Employers' Contributions received by the System, "rights to receive [the Revenues]," and the proceeds of any property or rights defined as

_____

[5]     At different stages of the proceedings, the Bondholders have framed the same argument in these two different ways.

Revenues.[6]  The Official Statement accompanying the bonds denotes that the "[b]onds are not payable from or secured by any other assets of the System."  The key to resolving the § 552 argument in this case is the limited definition of "Employers' Contributions."

We start by rejecting the Bondholders' argument, as did the Title III court, that, in the Bond Resolution's definition of Employers' Contributions, the limiting clause "which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113" modifies only the antecedent phrase "any assets in lieu thereof or derived thereunder" and not the other antecedent phrase "the contributions paid from and after the date hereof that are made by the Employers."  The Supreme Court has held that "[w]hen several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." Paroline v. United States, 572 U.S. 434, 447 (2014) (quoting Porto Rico Ry., Light & Power Co. v. Mor, 253 U.S. 345, 348 (1920)). That principle applies here, and the limiting clause here is

_____

    [6]    Not at issue are other categories of Pledged Property than those addressed in this opinion.  Pledged Property also comprises various funds, accounts, and additional rights of the System.  "Revenues" is also defined to include various other payments and income received by the System (and unrelated to Employers' Contributions).  No party has argued any of these additional definitions are relevant here, so we need not discuss them further.

- 18 -

applicable to both antecedent phrases. Such Employers' Contributions, and so the extent of the security interest granted by the Security Agreement, are limited to those contributions payable to the System pursuant to Sections 2-116, 3-105, and 4-113 of the Enabling Act. We turn to each of these sections.

As to pension benefits preserved under the 2013 Amendment's savings provision, see P.R. Laws Ann. tit. 3, § 761a (2013), Section 2-116(a) states that Employers' Contributions "should" cover the difference between the total cost of the System and employee contributions. Id. § 781 (repealed 2013). The Section also provides the formula for computation of each employer's monthly contribution. Id. Importantly, the Section provides that an employer is not obligated to contribute anything until the Employers' Contributions are determinable. See id. § 781(c), (d), (f). The Section also provides that future appropriations by the legislature would allocate the funds in the amount of the Employers' Contributions. Id. § 781(g).

As to benefits similarly preserved under the savings provision of the 2013 Amendment, Section 3-105 requires Employers' Contributions to be paid for salaried employees. Id. § 786-5. These are computed in the same manner as the Contributions are for other employees.

Finally, Section 4-113 states only that the intent of the Enabling Act is that contributions, annuities, benefits,

reimbursements, and administration expenses be obligations of the employers.  Id. § 787.

A.    As of the Petition Date, the System Did Not Have a Property Right, and the Bondholders Did Not Have a Security Interest, in Any Right To Receive Postpetition Employers' Contributions

We turn to the Bondholders' argument that their security interest in prepetition "rights" to receive Employers' Contributions gave them a security interest in Contributions received postpetition.  The Security Agreement covers only Contributions paid or payable to the System and rights to receive the same under the three provisions outlined above.

We conclude that the System's statutory authority to receive postpetition Employers' Contributions constituted merely an expectancy and not a property "right" as it is clear that the payment and the amounts of the Contributions depended on work occurring on and after the petition date.  It is also clear and our result is reinforced by the fact that language in the Bond Resolution and the Official Statement for the bonds explicitly contemplated that the payment of future Contributions was contingent on Puerto Rico's future fiscal status and the decisions of future Puerto Rico legislatures.  Because Employers' Contributions to the System based on payroll amounts for work occurring on and after the petition date could not be determined as of the petition date, the Contributions were not payable prepetition and the Bondholders did not have any security interest

in such contributions.  The Bondholders thus lacked any secured interest in property that could produce postpetition "proceeds" to which they could be entitled.  See 11 U.S.C. § 552(b)(1); N.H. Bus. Dev. Corp. v. Cross Baking Co. (In re Cross Baking Co.), 818 F.2d 1027, 1032 n.6 (1st Cir. 1987) (stating that "[§] 552(b) 'creates an exception for proceeds generated by prepetition collateral, and not for property acquired by the debtor or the estate postpetition or proceeds of the same.'" (quoting 4 Collier on Bankruptcy ¶ 552.02, at 552-7 (Lawrence King ed., 15th ed. 1987))).  So, the Bondholders did not have a prepetition property right in any postpetition contributions that might be made.  At most, the Bondholders had an expectation.[7]

---

[7]    Typically, local law creates and defines property interests in bankruptcy proceedings. Soto-Rios v. Banco Popular de P.R., 662 F.3d 112, 117 (1st Cir. 2011) (citing Butner v. United States, 440 U.S. 48, 54-55 (1979)).  Puerto Rico law recognizes that the mere expectancy of property is not itself a property interest.  See, e.g., Redondo-Borges v. HUD, 421 F.3d 1, 9 (1st Cir. 2005) (holding that, under Puerto Rico law, a government contract bidder had only a "unilateral expectation," not a vested property interest in a Puerto Rico agency's determination of the party's responsible bidder determination, even if it prevented the party from receiving future bids and payment from the government); Carrasquillo v. Aponte Roque, 682 F. Supp. 137, 141 (D.P.R. 1988) (distinguishing between "vested property interests" and "subjective expectancies" under Puerto Rico law).  This treatment of expectancies as not property interests is generally accepted. See Restatement (Third) of Trusts § 41 cmt. a (Am. Law Inst. 2003) ("By all traditional and current concepts of property, expectancies are not property interests.").

Importantly, the Bond Resolution explicitly states that the legislature of the Commonwealth might reduce (or, by implication, eliminate) Employers' Contributions, and so "adversely affect[]" the Bondholders. And legislative appropriations are the method by which the Commonwealth allocates the Employers' Contributions to the System. Although required by Section 2-116(g),[8] this directive could be disregarded by a subsequent legislature (to the Bondholders' detriment). See P.R. Laws Ann. tit. 3, § 781(g) (repealed 2013); United States v. Winstar Corp., 518 U.S. 839, 873 (1996) ("[O]ne legislature is competent to repeal any act which a former legislature was competent to pass; and one . . . legislature cannot abridge the powers of a succeeding legislature." (quoting Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 135 (1810))).

Moreover, the Official Statement for the bonds explicitly contemplates that, if faced with insufficient funds to pay approved appropriations, the Commonwealth would prioritize paying public debt over funding Employers' Contributions. As the Official Statement provides, "[t]his Constitutional restriction does not apply to Employers' Contributions made by public corporations and municipalities, because the funds of public

_____

[8] At least, this was true until the Contributions provisions were repealed with respect to future benefits in 2013 and fully repealed in 2017.

- 22 -

corporations and municipalities are not 'available resources' of the Commonwealth."  This language in the Official Statement put the Bondholders on notice that the Employers' Contributions stem from appropriations that the Commonwealth legislature could, and likely would, reduce if it could not fully fund its planned appropriations.

The Bondholders knew that if the Commonwealth experienced additional financial problems, such problems could adversely affect the Bondholders.  These known risks of alterations to the Employers' Contributions distinguish the instant case from the cases the Bondholders cite regarding liens on prepetition contracts.  See, e.g., United Va. Bank v. Slab Fork Coal Co., 784 F.2d 1188, 1191 (4th Cir. 1986) (deciding whether postpetition payments under a coal contract made subject to a prepetition lien were proceeds subject to the same lien).

The Bondholders argue that Cadle Co. v. Schlichtmann, 267 F.3d 14 (1st Cir. 2001), requires that we rule in their favor. Not so.  In fact, Cadle, although partially distinguishable on the facts, supports the Board.  In Cadle, a law firm granted to a bank a security interest in its accounts receivable, including a $300,000 contingency fee interest in escrowed settlement funds. Id. at 16.  Schlichtmann, a partner in the firm, later declared bankruptcy and the firm dissolved.  Id.  Schlichtmann completed the remaining work on the settlement, distributed the $300,000

among himself and his partners, and did not transfer anything to the security interest owner.  Id.  Although the finalization of the settlement depended on judicial approval, the security interest had attached to the escrowed funds.  Id. at 19.  Those funds were not "future fees", id. at 18 n.2, as "the amount of the fee . . . was established outside of Schlichtmann's bankruptcy," id. at 19, and nothing in the security agreement suggested that "the fees or the security interest were contingent on the performance of substantial further legal services," id. at 21.  On these facts, the Cadle court held that the contingent fee was proceeds of a prepetition account receivable, not after-acquired property, and so the security interest survived under § 552(b)(1). Id.

The facts here differ considerably.  The Bondholders claim a security interest in future, yet-to-be calculated or contributed Employers' Contributions, and not in deposited funds. Unlike the fee in Cadle, the Contributions at issue are only determinable postpetition and so are not "established outside of . . . bankruptcy."  Id. at 19.  Further, unlike in Cadle, the future Employers' Contributions necessarily depend on future payrolls, which depend in turn on the performance of labor by government employees. Although the finality of the settlement was contingent on judicial and regulatory approval, the secured property in Cadle was otherwise fixed prepetition and payable at

any time. The postpetition Employers' Contributions here, by contrast, are not payable until they are determined postpetition. As of the petition date, postpetition Employers' Contributions were too indeterminate for any "right" to receive postpetition Employers' Contributions to be prepetition property of which those postpetition Contributions could be proceeds.[9]

B.    The Bondholders Do Not Have Liens on "Obligations" of Employers To Solve Any Deficiency in the Pension System

The Bondholders raise another theory of recovery under § 552(b): they claim to have a prepetition security interest in payments on the employers' "obligation" to pay down the actuarial deficit, that Employers' Contributions are proceeds of this actuarial deficit obligation, and so they conclude the Bondholders have a security interest in these actuarial deficit "proceeds" under § 552(b)(1).[10] This theory fails both because the plain

_____

[9]    Valley Bank & Trust Co. v. Spectrum Scan, LLC (In re Tracy Broadcasting), 696 F.3d 1051 (10th Cir. 2012), cited by the Bondholders, is, of course, not binding on us and further is similarly distinguishable. Tracy held that the right to the proceeds of selling a Federal Communications Commission license was prepetition property, the postpetition revenues from selling the license were proceeds of that property, and so the creditor's security interest in the sale proceeds survived the debtor's bankruptcy under § 552(b)(1). Id. at 1058–59.

In Tracy, the FCC license already existed, so the right to its sale proceeds was more analogous to uncalculated accounts receivable than the "right to receive" Employers' Contributions, which arise postpetition from employee labor and salary every month.

[10]    Even if the Bondholders' actuarial deficit argument is meant to show that they had liens on postpetition Employers'

- 25 -

language of the Security Agreement and Bond Resolution does not include the Bondholders' purported collateral and because the Employers' Contributions are not "proceeds" as a matter of fact or of law.

1. The Security Agreement's Language Does Not Cover the Actuarial Deficit

As said, the Bondholders only had a security interest in Contributions made under the three Puerto Rico statutory provisions discussed earlier. As to these three provisions, the Enabling Act does not create an obligation of employers to pay the actuarial deficit. In consequence, there is no security interest granted by the Security Agreement in payments on any purported employer obligation to pay down the actuarial deficit.

As the Title III court correctly recognized, even were employers required to make actuarial deficit contributions, employers could not be obligated to pay actuarial deficit contributions until such deficiencies were determinable. Section 2-116(e) provides that "the [actuarial deficit] shall constitute a deficiency in the employer contribution" and that "[t]he

---

Contributions of a determinable amount (that is, the actuarial deficit as of 2013), this argument fails for the reasons stated in Section III.A. In the interest of completeness, we address in the text the Bondholders' actuarial deficit argument as one separate from the Bondholders' primary § 552 argument, and not merely as a response to the Title III court's conclusion that the Bondholders' purported prepetition collateral was insufficiently "fixed in form or quantity."

obligation accrued as a result of this deficiency shall constitute an actuarial deficit for the System and an obligation of the employer." P.R. Laws Ann. tit. 3, § 781(e). The Bondholders did not acquire a security interest explicitly in payments toward the deficit. The statutory provisions that do give the Bondholders a security interest merely require employers to pay whatever rate the System's Administrator sets (not the entire deficit). See id. §§ 781(c), (d), 786-5.

Because this deficit is calculated after the payment of the employers' monthly contribution, as a factual matter, it cannot be a part of that contribution. See id. § 781 (c)-(e). Under Section 3-105, Employers' Contributions are based on the salary of each participant covered by the System retirement program. Id. § 786-5. And the Employers' Contributions are required "to be made concurrently with employee contributions," id. § 781(d), and these are made monthly, id. § 780. The Title III court correctly observed that, before employees actually worked, those Contributions were not, and could not be, "fixed in form or quantity." The Employers' Contributions could not form a prepetition pool of obligations in which the Bondholders have a security interest.

In addition, Section 1-110(d) of the Enabling Act provides that the System's Administrator shall annually "certify the . . . amounts which shall be contributed by [employers]" and

- 27 -

can "require [employers] to make additional payments to eliminate [accumulated actuarial] shortages."  P.R. Laws Ann. tit. 3, § 782(d).  That section makes it plain that employers could not be required to make additional payments until there were certifications.[11]

Our conclusion is buttressed by Section 4-113, which provides:  "It is the intent of §§ 761 et seq. of this title [i.e., the Enabling Act] that the contributions required from the employer, as well as all annuities, benefits, reimbursements, and administration expenses, shall constitute obligations of the employer."  P.R. Laws Ann. tit. 3, § 787 (2013).  The provision expresses an aspiration that Employers' Contributions will cover the System's cost, but it does not create an additional obligation that alters Employers' Contributions.  Nor does it create an interest in property to which the Bondholders' Security Agreement applies.  Further, this provision clearly distinguishes between contributions and the other expenses of the System which constitute employers' obligations.

The Bondholders argue that the 2013 Amendment, by freezing the accrual of future benefits, fixed prepetition the total pension liability of the System.  They then contend that

_____

[11]   We do not reach the additional argument by the System that even if the employer had a payment obligation to the System, that obligation would not constitute property of the System.

Sections 2-116(e) and 4-113, which each state that deficiencies "shall constitute" employer obligations, accord the System an enforceable right to collect Employers' Contributions.  See P.R. Laws Ann. tit. 3, §§ 781(e), 787.  The Bondholders characterize the System's pension liability as a pool of benefits (fixed by the 2013 Amendment) for which all employers are jointly liable.  In consequence, they argue, Employers' Contributions are merely a mechanism of standardizing this liability month-to-month.  Not so.  The Bondholders' view of the System contradicts the Enabling Act's plain language, and their asserted security interest exceeds the language of the Security Agreement.  The 2013 Amendment does not change whether the Bondholders had a prepetition security interest in postpetition Employers' Contributions.  It does not alter the extent of the Security Agreement and, for the Contributions it did not discontinue, it did not alter their calculation or payment.  The 2013 Amendment is irrelevant to the determination of whether the § 552(b)(1) exception applies.

    2.    The Employers' Contributions Cannot Be "Proceeds" of Any Deficit

        Employers' Contributions cannot be proceeds of any secured, prepetition property for another reason.  The Enabling Act does not include a provision that creates an obligation of the employers to plug a deficiency in the System, so no such obligation exists.  It is impossible to have a lien on something that does

not exist.  See Sims v. Jamison, 67 F.2d 409, 411 (9th Cir. 1933) ("[T]here can be no lien upon something which does not exist at the time of the [bankruptcy] adjudication.").  The Employers' Contributions cannot be the proceeds of some property interest on which the Bondholders do not have a lien.

C.  The Amendment of Article 9 of the Puerto Rico Uniform Commercial Code Does Not Affect the Resolution of the § 552 Issue

The Bondholders argue that the expanded definition of collateral and proceeds in the amended Article 9 of Puerto Rico's Uniform Commercial Code ("UCC") renders as secured proceeds the Employers' Contributions.  This lacks merit.

First, Congress codified the term "proceeds" in § 552(b)(1) well before Puerto Rico or any state revised Article 9.  Compare Bankruptcy Abuse Prevention Act of 2005, 119 Stat. 23 (2005) (amending § 552 in 2005, its most recent amendment), with Law No. 21 of January 17, 2012, 2012 P.R. Laws 162 (codified at P.R. Laws Ann. tit. 19, §§ 2211-2409) (implementing the American Law Institute's revisions to the UCC on January 13, 2013); Paul Hodnefield, Proposed 2010 Amendments to UCC Article 9: State-by-State Adoption (June 6, 2015), Westlaw Practical Law.  When enacting, or last amending, § 552, Congress employed the definition of "proceeds" as it was at that time (not as it would be if there were a material alteration made in a future alteration of Article 9).  See Saint Francis Coll. v. Al-Khazraji, 481 U.S.

- 30 -

604, 610 (1987) (stating that courts should look to a statutory term's definition when Congress enacted the statute). So, the revised definition in Puerto Rico law of Article 9 is irrelevant.

Second, even if the revised UCC Article 9 expanded the concept of collateral and altered Puerto Rico law distinguishing between expectancies and property (which we need not decide), the Bondholders' claims still require a collection on a receivable. Here, there were no postpetition collections on, i.e., proceeds of, any prepetition receivables, i.e., collateral, onto which the Bondholders' lien might attach. See P.R. Laws Ann. tit. 19, § 2212(a)(64). The only receivables at issue are the Employers' Contributions and, as said, such Contributions only become receivables after the employers' employees actually performed the work necessary for payroll to be calculated.[12] The Bondholders do not have the security interest they claim to have in postpetition Employers' Contributions.

IV.
The Bondholders Did Not Have Special Revenue Bonds Under
§ 902(2)(A) or (D)

The Bondholders argue that the Employers' Contributions are special revenues within the meaning of 11 U.S.C. § 902(2)(A) and (D). Section 902(2)(A) defines as "special revenues" any

---

[12] This analysis does not address Employers' Contributions calculated and owed, but not paid to the System, before the filing of the Title III petition. The Board concedes that the Bondholders have a security interest in these receivables.

- 31 -

"receipts derived from the ownership, operation, or disposition of . . . systems . . . primarily used or intended to be used primarily to provide transportation, utility, or other services." Id. § 902(2)(A). Section 902(2)(D) defines as "special revenues" "other revenues or receipts derived from particular functions of the debtor." Id. § 902(2)(D). This statutory analysis turns on whether the Employers' Contributions are "derived from" the ownership or operation of a system of "other services" provided by the System or the "particular functions" of the System. The "particular function" of the System is limited to collecting Employers' Contributions, making investments, and paying out pension benefits.

The Title III court concluded that the Employers' Contributions were not special revenues. Applying the canon of ejusdem generis, the Title III court concluded that, in § 902(2)(A), "other services" comprised only "physical system[s] of providing services to third parties." Andalusian, 385 F. Supp. 3d at 154. The court then held that, because the System did not provide transportation, utility, or other services involving a "physical system," the Bondholders did not have special revenue bonds under § 902(2)(A). Id.

Turning to § 902(2)(D), the Title III court stated that the System served as a conduit for the deferred compensation of government employees through the Contributions, it did not charge

any fees for its services, the Employers' Contributions were not derived from a "particular function" of the System, and so Bondholders did not have special revenue bonds under § 902(2)(D). Id.

On appeal, the Bondholders argue that the System derives the Employers' Contributions from its ownership and operation of the pension system because, as defined in the Bond Resolution, the System performs its pension functions "due to its statutory right to receive Employers' Contributions." They define "derive" as "to take or receive especially from a specific source," citing Derive, Webster's Ninth Collegiate Dictionary (1986). The Bondholders also argue that, because the System receives Employers' Contributions, for that same reason it performs its "particular functions," and Employers' Contributions are "fees" for providing pension benefits, the Employers' Contributions are special revenues under § 902(2)(D).

Neither the Bankruptcy Code nor PROMESA give "derived from" a special definition. In consequence, we "construe [it] in accordance with its ordinary or natural meaning." FDIC v. Meyer, 510 U.S. 471, 476 (1994) (citing Smith v. United States, 508 U.S. 223, 228 (1993)). In this context, we interpret "derived from" as requiring that Employers' Contributions originate in the System's "particular functions" or its "ownership, operation, or disposition of" a system of "other services." See Derive,

Webster's Third New International Dictionary (1993) (defining "derive" as "to have or take origin: ORIGINATE: STEM, EMANATE"); Derive, Merriam-Webster Unabridged Dictionary, http://unabridged.merriam-webster.com/unabridged/derive (last visited Jan. 29, 2020) (same); Derive, Oxford English Dictionary Online, https://oed.com/view/Entry/50613 (last visited Jan. 29, 2020) (defining "derive" as "[t]o flow, spring, issue, emanate, come, arise, [or] originate").[13] The Bondholders' argument fails to meet this test.

We need look only to the plain language of the statute to reject the Bondholders' special revenues arguments.[14] See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, th[e] first canon [of statutory

---

[13] We use the definition of "derive" in its intransitive sense, as opposed to in its transitive sense (as the Bondholders do). See Bell Commc'ns Research, Inc. v. Fore Sys., Inc., 62 Fed. App'x 951, 959 (Fed. Cir. 2003) (interpreting similar "derived from" language as intransitive and concluding the best definition for "derive" was "to have or take origin: ORIGINATE: STEM, EMANATE").

[14] The legislative history of § 902(2)(D) also supports our conclusion. It indicates that Congress intended § 902(2)(D) to capture miscellaneous revenues accruing from government services to the public, like "regulatory fees and stamp taxes imposed for the recording of deeds," H.R. Rep. No. 100-1011, at 7 (1988), as reprinted in 1988 U.S.C.C.A.N. 4115, 4121; S. Rep. No. 100-506, at 21 (1988), or "tolls or fees relating to a particular service or benefit," S. Rep. No. 100-506, at 21.

construction] is also the last: 'judicial inquiry is complete.'"
(quoting <u>Rubin</u> v. <u>United States</u>, 449 U.S. 424, 430 (1981))).

The System does not charge any fees, much less any in which the purported "special revenues" could originate.  Employers do not, as the Bondholders assert, pay the System in exchange for it later paying pension benefits to employees.  Instead, the employers (and employees) pool retirement savings in the System, a <u>trust</u>, for the future benefit of the employees.  The Employers' Contributions originate in the work of the employees that generate the contributions[15] and the statutory obligation of employers to contribute.

Neither the System's "particular function" nor its "ownership" or "operation" of its system of providing pension services produces any revenue.  Indeed, the Employers' Contributions, far from deriving from a "particular function" of the System, come from annual appropriations of the Commonwealth. P.R. Laws Ann. tit. 3, § 781(g) (repealed 2013).  As the Title III

---

[15]    The Bondholders argue that, because most government labor does not actually generate revenue, the Employers' Contributions are not derived from the labor of the employees. But this lacks merit.  The profitability of the employees is irrelevant.  Under the Enabling Act, an employer must contribute to the System a percentage of the salary it pays its employee. P.R. Laws Ann. tit. 3, §§ 781(d), 786-5.  This salary, in turn, originates in the employee's labor.  But for the labor of the employee and this statutory obligation, the employer would not need to contribute.  Accordingly, the Employers' Contributions are derived from employee labor.

court correctly concluded, the System merely "functions as a conduit for distribution of Employers' Contributions." Andalusian, 385 F. Supp. 3d at 154.

As to § 902(2)(A), the Employers' Contributions do not originate in either the System's ownership or disposition of pension assets, or its ownership or operation of the pension system as a whole. That the Puerto Rico legislature may have intended to direct the Employers' Contributions to the System because it owned or operated a system of pension services does not mean the Contributions originate in the System's ownership or operation. The Contributions originate in, and so are derived from, employee labor and statutory obligations, both of which occur and exist separately from any of the System's ownership interests or operation activities. In consequence, the Employers' Contributions are not special revenues under § 902(2)(A).[16]

Similarly, as to § 902(2)(D), that the "particular functions" of the System relate to the management, investment, and distribution of these funds does not mean the Contributions originate in these activities. We conclude that, although the Contributions may relate to and support the System's functions, they do not originate in them, analogously to our § 902(2)(A)

---

[16] We need not decide the congressional meaning of "other services" in § 902(2)(A), as the Employers' Contributions are not derived from the System's ownership, operation, or disposition of its system of pension services.

reasoning.  The Contributions originate in employee labor and the statutory obligation.  Accordingly, the Employers' Contributions are not derived from any "particular function" of the System, and so are not "special revenues" under § 902(2)(D).

V.
## Section 552 Applies Retroactively to the Security Agreement

We address the Bondholders' fallback argument that if our reading of § 552 led to a rejection of their arguments, then applying § 552 to them would "raise grave constitutional questions."  We disagree.  The Bondholders frame the issue as one of constitutional avoidance.  They argue first that Congress has not explicitly commanded that PROMESA applies § 552 retroactively.  The Bondholders then argue that the canon of constitutional avoidance requires us to interpret PROMESA as applying § 552 prospectively only, because, in their view, interpreting § 552 to impair retroactively the Bondholders' liens would violate the Takings Clause.  See Jones v. United States, 529 U.S. 848, 857 (2000) (discussing the role of the canon of constitutional avoidance "where a statute is susceptible of two constructions" (quoting U.S. ex rel. Att'y Gen. v. Del. & Hudson Co., 213 U.S. 366, 408 (1909))).  The Bondholders argue that, because § 552 did not apply to liens granted by Puerto Rico and its instrumentalities at the time when the Bondholders purchased the bonds in 2008, see Franklin Cal. Tax-Free Tr. v. Puerto Rico, 805 F.3d 322, 329–31

- 37 -

(1st Cir. 2015), aff'd 136 S. Ct. 1938 (2016), then applying § 552 to the Security Agreement after they purchased the bonds would constitute an unconstitutional taking.

The Title III court addressed similar arguments and concluded that Congress, by its purpose in enacting PROMESA to address Puerto Rico's financial crises, clearly intended to apply § 552 retroactively. Andalusian, 385 F. Supp. 3d at 154–55. That ruling was correct.

Courts typically presume Congress intends a statute to operate only prospectively, but will give retrospective operation to a statute if such construction is "the manifest intention of the legislature." Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 844 (1990) (quoting Union Pac. R.R. Co. v. Laramie Stock Yards Co., 231 U.S. 190, 199 (1913)). PROMESA's plain language controls here and determines the issue. A court cannot adopt a statutory construction "plainly contrary to the intent of Congress" to avoid a constitutional question. Miller v. French, 530 U.S. 327, 341 (2000) (quoting Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades  Council, 485 U.S. 568, 575 (1988)). The canon of constitutional avoidance can apply only when the statute is ambiguous. See id. (citing Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212 (1998)).

PROMESA's effective date states that "[s]ubchapters III and VI shall apply with respect to debts, claims, and liens (as

- 38 -

such terms are defined in section 101 of Title 11) created before, on, or after [June 30, 2016]."  48 U.S.C. § 2101(b)(2) (emphasis added).  PROMESA incorporates § 552 of the Bankruptcy Code under Subchapter III.  Id. § 2161(a).  PROMESA also adopts the Code's definitions of "lien" and "security interest."  Id. § 2161(a), (c); see also 11 U.S.C. § 101(37) (defining "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation"); 11 U.S.C. § 101(51) (defining "security interest" as a "lien created by an agreement").  This shows that Congress plainly intended to apply § 552 to security interests and agreements created before the enactment of PROMESA.[17] See, e.g., Vartelas v. Holder, 566 U.S. 257, 267 (2012) (stating

---

[17]    Given the plain language of the statute, we need not address the parties' arguments regarding PROMESA's underlying policy rationale or that the Bondholders waived any argument regarding § 2101(b)(2).

   The Bondholders have not raised in their initial appellate brief an argument based on their counterclaim V for declaratory judgment.  We do not decide an argument not presented to us.  See Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir. 1983).  Nor is it clear that we would have jurisdiction over such a Takings Clause claim if it were made. See Horne v. Dep't of Agric., 569 U.S. 513, 527 (2013) ("A claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute."  (quoting E. Enters. v. Apfel, 524 U.S. 498, 520 (1998) (plurality opinion of O'Connor, J.))).

   Indeed, the Bondholders brought a different action in the Court of Federal Claims under its exclusive Tucker Act jurisdiction, alleging that the 2017 Amendment effected an unconstitutional taking of their liens on Employers' Contributions.  Altair, 138 Fed. Cl. at 752-54.

that a statutory provision applying "before, on, or after" the statute's enactment date required retroactive application); Goncalves v. Reno, 144 F.3d 110, 131–32 (1st Cir. 1998) (same).

PROMESA's statutory language clearly expresses an intent that § 552 apply retroactively, which distinguishes the instant case from United States v. Security Industrial Bank, 459 U.S. 70 (1982), which the Bondholders argue requires us to give only prospective effect to PROMESA's incorporation of § 552. This contention lacks merit. Security Industrial Bank held that "[n]o bankruptcy law shall be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress." Id. at 81 (emphasis added). There, the Supreme Court concluded that 11 U.S.C. § 522(f)(2), a recently enacted provision of the Bankruptcy Reform Act of 1978, did not apply retroactively.[18] Id. at 82. Whether or not there is a property right at issue, as said, Congress provided an explicit command at 48 U.S.C. § 2101(b)(2) to apply PROMESA retroactively. Congress did not do so for the statute at issue in Security Industrial Bank. See 459 U.S. at 81.

The Bondholders rely on PROMESA's "[a]pproval of fiscal plans" provision for their interpretation argument, but that

---

[18]   Security Industrial Bank did not address any issues regarding PROMESA or the application of an existing bankruptcy provision to a previously unprotected debtor.

reliance is misplaced. 48 U.S.C. § 2141. The Bondholders argue that, because PROMESA requires the Board to develop a "Fiscal Plan" that "respect[s] the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016," id. § 2141(b)(1)(N), Congress intended that PROMESA not alter the "status quo" existing before PROMESA's enactment. But this provision governs only the Board's Fiscal Plan, not the operation of Title III of PROMESA. We cannot read it to find Congress did not intend for § 552 to apply retroactively, in light of the express language earlier. We reject the Bondholders' prospective construction argument.

## VI.
## Conclusion

We emphasize that we decide each of these three claims narrowly, based on these specific facts.

Affirmed. Costs are awarded to the Board.

- 41 -